UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

|  |  |
|---|---|
| [UNDER SEAL],<br>　　　　　Plaintiff,<br><br>v.<br><br>[UNDER SEAL],<br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT

**(FILED IN CAMERA AND UNDER SEAL)**

**08 CA 10541 DPW**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, ex rel. ROBERT J. DYER, Plaintiffs, | ) ) ) ) | COMPLAINT |
| v. | ) ) ) | (FILED IN CAMERA AND UNDER SEAL) |
| RAYTHEON COMPANY, Defendant. | ) ) ) | |

# 08 CA 10341 DAW

## I.  NATURE OF THE ACTION

1.  This is an action brought on behalf of the United States of America (the

"Government") by Plaintiff-Relator, Robert J. Dyer (the "Relator"), against Defendant, Raytheon

Company ("Raytheon" or Defendant") pursuant to the *Qui Tam* provisions of the False Claims

Act ("FCA"), 31 U.S.C. §§3729-33 and the terms of defense contracting programs. The Relator

also alleges that Defendant has violated the anti-retaliation provisions of the FCA, 31 U.S.C.

§3730(h). Pursuant to 31 U.S.C. §3730(b)(2), this action is brought *in camera and under seal*.

## II.  PARTIES

2.  The Relator is a citizen of the United States. He resides in Beverly, Massachusetts.

From 2000 to 2007, the Relator was employed by Defendant in its Lexington, MA and Waltham,

MA offices. He brings this *Qui Tam* action based upon direct and unique information obtained

during the period of his employment with Defendant. Relator is providing an appropriate

"Disclosure Statement" to the Government, as required by law.

3. The Defendant is a publicly traded Fortune 500 company. Defendant is a Delaware corporation with headquarters in Waltham, Massachusetts. Defendant designs and manufactures a wide variety of military products under numerous contracts with the Government.

## III. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730.

5. Venue is proper because the Defendant transacts business in this judicial district and acts proscribed by 31 U.S.C. §3729 have been committed by the Defendant in this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a).

6. To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. §3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the Government is a party; there has been no "public disclosure" of these allegations or transactions; and the Relator is the "original source" of the information upon which these allegations are based.

## IV. RELEVANT FEDERAL LAWS

7. The FCA, 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the Government any false or fraudulent claim for payment, a violation of federal law for which the Government may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

2

8. The FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the Government may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

9. The FCA, 31 U.S.C. § 3729(a)(3), makes any person, who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

10. The FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the Government may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

11. The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

12. The FCA, 31 U.S.C. § 3730(h), makes it illegal to discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms or conditions of employment because of lawful acts done by the employee in furtherance of an

3

ID # 548396\01\16048-2\ 03 03 2008

action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section.

## V.    STATEMENT OF FACTS

13.    This case involves the fraudulent misrepresentation of internal financial performance data by Defendant's executives and managers solely for the purpose of securing higher incentive compensation payments for themselves and certain of their subordinates. In 2001, a special incentive plan was put in place by Defendant's Board of Directors to encourage relevant business units to improve operational efficiency as measured by the metric working capital turnover. Raytheon executives David Farnsworth, then the Chief Financial Officer of the Command, Control, Communication and Information Systems ("C3I") business unit, Gary McCauley, Raytheon's Vice President of Financial Analysis, and Duncan Noyes, then Manager, Budgets and Planning, of the C3I business sector, conspired to circumvent the controls placed on this incentive program and falsify the reporting for the C3I business sector, with knowledge in advance of how the metric would be calculated.

14.    Messrs. Farnsworth, McCauley and Noyes aggressively covered up their misdeeds through misdirection, dishonesty, and retaliation against Relator. The incentive bonuses awarded were not fairly earned through improved business operational performance by the rules of the incentive program that had been approved by the Government and Defendant's Board of Directors. This resulted in an overcharge to the Government of approximately $1.165 Million in excess overhead charges for Plan Year 2001 and, on information and belief, additional false claims for Plan Years 2002 through 2005.

15.    Relator was hired during February 2000 at the direction of Defendant's then Chief Financial Officer, Frank Caine, to construct an enterprise level working capital

4

improvement program known as the Raytheon Working Capital Improvement Program (the "RWIP").

16.     The RWIP consisted of four main elements, as follows:

    (a)     improved financial reporting; See Exhibit 1, attached hereto and incorporated herein;

    (b)     education (including a simulation-based training program for decision-makers;

    (c)     an awareness campaign; and

    (d)     changes to the executive incentive system.

17.     In or around March 2001, Defendant's Board of Directors approved the RWIP for approximately 2,000 executives at all levels of Raytheon in relevant business units.

18.     Each relevant business unit was asked to achieve a 0.6 turn improvement in working capital turnover and a sliding incentive payout scale was established ranging from 50% achievement to a maximum of 100% achievement. For purposes of example only, a 0.3 turn improvement in working capital would represent 50% achievement of the target and result in a 50% payout of the targeted bonus.

19.     The RWIP was intended to reduce Defendant's working capital investment by approximately $470 Million for Plan Year 2001, which would reduce the cost of capital (i.e., interest on borrowed capital) by approximately $33 Million at 100% achievement. The total bonus payments at 100% achievement were targeted at approximately $14.1 Million, which was projected to generate an approximate $19 Million savings from the RWIP in Plan Year 2001 alone.

5

20.     During approximately March 2001, the RWIP was presented to the Management
Development and Compensation Committee of the Defendant's Board of Directors. In
presenting the RWIP to Defendant's Board of Directors, the Defendant's Chief Financial
Officer, Frank Caine and its Vice President of Human Resources, Keith Peden, stated that only
operational and process improvements would count toward achievement of the RWIP targets.
The RWIP was to be self-funding, i.e., any incentive bonuses paid to Defendant's management
would be funded exclusively by working capital savings. See Exhibit 2, attached hereto and
incorporated herein.

21.     Defendant's Board of Directors approved the RWIP language on the basis that
only operational and process improvements would count toward target achievement. Brochures
were delivered to program participants explaining the RWIP that also contained this
requirement. See Exhibit 3, attached hereto and incorporated herein. Further, it was clear in
educational and training materials that were provided to Defendant's managers that any false
improvement to working capital turnover, such as mere accounting reclassifications, were
ineligible for consideration toward achievement of the RWIP incentive targets.

22.     As part of the training provided to Defendant's managers, Relator produced and
distributed to the relevant business units a PowerPoint presentation to help those business unit
leaders explain the RWIP. See Exhibit 4, attached hereto and incorporated herein.

23.     In or about August 2001, Defendant's Vice President for Financial Analysis,
Gary McCauley, and the Relator presented an overview of the program to Herb Homer, the
officer at the Defense Contract Audit Agency ("DCAA") in charge of Defendant. See Exhibit 5,
attached hereto and incorporated herein. In this briefing, Mr. McCauley and the Relator told Mr.
Homer that only real improvements will count toward the RWIP and that accounting

6

reclassifications will not be considered. Both Mr. McCauley and the Relator explained the self-funding justification for the RWIP. Defendant required Mr. Homer's approval in order to be allowed to charge the Government for the RWIP as part of the overhead for its employees' compensation. The RWIP program was described by Mr. McCauley and the Relator as being not only good for Defendant but also for the Government as well. The kinds of improvements to the supply chain, production and billing practices that would be required for Raytheon's business units to achieve the working capital targets are improvements that reduce lead time, improve quality and reduce costs in the long run, thus maximizing efficiencies on the various contracts between Defendant and the Government.

24.     As a result of the meeting with Mr. McCauley and the Relator, Mr. Homer approved the program on behalf of the DCAA. He asked them to develop a PowerPoint pitch for the Defendant's business units to explain the RWIP to their respective local DCAA officers. The PowerPoint that was distributed to the C3I business Sector is attached hereto and incorporated herein as Exhibit 6.

25      At about that same time, Frank Marchilena, the President of Defendant's C3I business unit, distributed a letter to C3I RWIP participants explaining the program. In this letter, he referenced the brochure that stated only real improvements would be counted and not accounting reclassifications. See Exhibit 3, attached hereto and incorporated herein. A copy of Mr. Marchilena's letter is attached hereto and incorporated herein as Exhibit 7.

26.     On or about November 30, 2001, the Relator sent an e-mail request to all relevant business unit Chief Financial Officers requesting details concerning any accounting reclassifications during the Plan Year. Relator made clear that under the terms of the RWIP

7

such reclassifications should be excluded from the measurement of working capital turnover. See Exhibit 8, attached hereto and incorporated herein.

27.     On or about December 17, 2001, Duncan Noyes responded to the Relator's November 30, 2001 e-mail request and noted two small accounting adjustments that were immaterial. See Exhibit 9, attached hereto and incorporated herein.

28.     On or about the December 19, 2001, Judy Durkin, then the Corporate Director of Financial Planning and Analysis, requested a meeting with the Relator in order to discuss the contents of Exhibit 9. The Relator had copied Ms. Durkin on Mr. Noyes' e-mail.

29.     During their meeting, Ms. Durkin informed the Relator that there had been a significant accounting reclassification at C3I during Plan Year 2001 that, based on the RWIP rules, should be removed from consideration of the C3I business unit's working capital turnover measurement.

30.     That same day, the Relator e-mailed Mr. Noyes in an attempt to document and make an appropriate adjustment for this significant reclassification. See Exhibit 10, attached hereto and incorporated herein. The Relator also forwarded his e-mail request to Ms. Durkin in an e-mail confirming their conversation and referencing the reclassification that she had informed the Relator about, as well as asking her for additional detail. See Exhibit 11, attached hereto and incorporated herein.

31.     By e-mail dated December 21, 2001, Mr. Farnsworth, who was Mr. Noyes' manager, re-sent details of the already disclosed minor accounting adjustments. Mr. Farnsworth refused to admit to the major reclassification entry that Ms. Durkin had disclosed to the Relator. See Exhibit 12, attached hereto and incorporated herein. The Relator forwarded this response to his manager, Mr. McCauley, with a note that the Controller's group (of which Ms. Durkin was a

8

part) had informed him of "another significant $20+ million reclass entry." See Exhibit 13, attached hereto and incorporated herein.

32.    On or about January 2, 2002, the Relator again requested that Mr. Farnsworth confirm that there are no entries other than the two minor reclassifications that would impact C3I's working capital turnover performance. See Exhibit 14, attached hereto and incorporated herein. That same day, Mr. Farnsworth responded by email that there were no other reclassifications to report. See Exhibit 15, attached hereto and incorporated herein. Mr. Farnsworth's representation made in the January 2, 2002 email was untrue and made with knowledge of its falsity and in furtherance of his scheme to defraud the Government.

33.    On or about January 3, 2002, the Relator obtained verification from Defendant's corporate accounting department that a $23.7 Million reclassification had been made in January 2001 by the C3I business unit. See Exhibit 16, attached hereto and incorporated herein. This reclassification, by itself, accounted for 33% of the improvement in working capital turnover, or .2x of C3I's .6x turn improvement for the 2001 Plan Year.

34.    Unbeknownst to the Relator at that time, for nearly the entire Plan Year 2001, the C3I business unit had booked a reclassification for its Space Imaging Joint Venture from a short-term to a long-term receivable. See Exhibit 17, attached hereto and incorporated herein. Mr. Farnsworth, who had intimate knowledge of the RWIP from his close personal friend and co-conspirator, Mr. McCauley, had identified this transaction as a way to circumvent the performance accounting for the RWIP. Without the reclassification of the Space Imaging Joint Venture, the RWIP program payout for C3I would have been at a 67% funding rate, or $1.165 Million lower. The total payout at 100% was approximately $3.4 Million to a total of more than 300 participants. See Exhibit 18, attached hereto and incorporated herein.

9

35. Over the next two days, the Relator repeatedly tried to contact his manager, Mr. McCauley, by telephone and email in order to discuss Relator's concerns about the significant reclassification that the C3I business unit was using to defraud the Government in connection with the RWIP. See Exhibits 19 and 20, attached hereto and incorporated herein. In a telephone conversation either that night or the next morning, the Relator told Mr. McCauley directly about the issue and that he would have a tough time telling Frank Caine (Defendant's Corporate Chief Financial Officer) that the RWIP results were appropriate. Mr. McCauley told Relator that he did not have to disclose this information to Mr. Caine.

36. As a result of his concerns, later that same week the Relator took the issue to Ed Pliner, Defendant's Corporate Controller, who listened and then telephoned Mr. Farnsworth to discuss the issue. After that call, Mr. Pliner informed the Relator that he did not think there was any intention to "hide the ball." Relator told Mr. Pliner that he disagreed and that he may have to take the issue to Mr. Caine for review.

37. Soon thereafter, Mr. Farnsworth telephoned Mr. McCauley to complain about the Relator's behavior. Shortly thereafter, Mr. McCauley and the Relator spoke by telephone and Mr. McCauley instructed the Relator that the issue is done and said: "We will never speak of this again, is that clear?" It was clear to the Relator at that point that if he continued to push the issue and brought it to Mr. Caine's attention, he would be fired from his position at Raytheon.

38. On or about January 9, 2002, Mr. McCauley emailed the Relator to ask if there was a standard procedure for making adjustments such as the trivial reclassifications that the C3I business unit had disclosed. See Exhibit 21, attached hereto and incorporated herein. That same day, the Relator responded that no other business unit had attempted to circumvent the rules other than C3I, and the Relator reiterated that the same treatment recommended for the trivial

10

entrics must also be applied to the \$23.7 Million reclassification. See Exhibit 22, attached hereto and incorporated herein. Later that same day, Mr. McCauley sent an email to the Relator claiming that the larger reclassification was in a different category. This statement is false and was made with knowledge of its falsity in furtherance of the scheme to defraud the Government. See Exhibit 23, attached hereto and incorporated herein.

39.    In order to attempt to justify his unlawful conduct, Mr. Farnsworth sent an email to Mr. McCauley detailing the \$23.7 Million reclassification and explaining his justification for why it should count towards bonus participation of the C3I business unit in the RWIP. See Exhibit 24, attached hereto and incorporated therein. Mr. McCauley forwarded this email to the Relator. Shortly thereafter, Mr. McCauley told the Relator in a meeting that the C3I accounting reclassification will be allowed to count as a real improvement for RWIP purposes.

40.    In or about the following week, the Relator wrote a "final funding recommendation" analysis to be included with the year-end 2001 RWIP report. See Exhibit 25, attached hereto and incorporated herein. In his analysis, the Relator detailed the fraudulent \$23.7 Million entry. Mr. McCauley removed this portion of the analysis when he forwarded the final financial report to Defendant's senior management.

41.    During March 2002, managers and executives in the C3I business unit were paid bonuses that are approximately \$1.165 Million higher than those earned under the rules of the RWIP approved by Defendant's Board of Directors and the Government for the Plan Year 2001. The RWIP funded at \$3.4 Million, equal to 97% of the target for the C3I business unit. The performance bonus for the C3I business unit President, Mr. Marchilena, was approximately \$219,000. The C3I Chief Financial Officer, Mr. Farnsworth, earned a bonus of approximately

11

$95,000. The final funding presentation to Defendant's Board of Directors is attached hereto as Exhibit 26 and incorporated herein.

42.     Approximately several months later, during the spring 2002, Mr. McCauley informed the Relator during his annual performance review that Mr. Farnsworth had told him in January that Mr. McCauley should terminate the Relator's employment. Mr. McCauley used this comment as evidence of what he termed the Relator's need to further develop his "executive skills."

43.     Some months after the Relator's annual performance review, the corporate financial analysis department where he worked was allegedly reorganized. Although all of the Relator's peers continued in the same or similar roles, he was left without a position. As part of the so-called reorganization, Mr. Farnsworth, one of the perpetrators of the fraudulent claim described herein, replaced Mr. McCauley as Vice President of Finance. Mr. Farnsworth appointed his subordinate, Mr. Noyes, who had been instrumental in implementing this fraudulent scheme against the Government, to take over Mr. Dyer's role as Senior Manager Financial Analysis.

44      As a result of the so-called reorganization, the Relator was compelled to seek other positions within Raytheon. Although the Relator had a number of very positive interviews for financial positions in various Raytheon business units, and received extremely positive feedback about his qualifications and accomplishments, none of the executives in those finance departments offered him a position.

45.     The Relator eventually had an interview with Don Ronchi, VP Learning, Six-Sigma & Supply Chain, for a position as Chief Financial Officer for that organization. Mr. Ronchi appeared very excited and was encouraging about the Relator's candidacy. He also told

12

the Relator that the predecessor in the role, Bob Shaunessy, had also been very supportive of the Relator's candidacy. Nonetheless, after speaking with the Corporate Controller, Ed Pliner, Mr. Ronchi backed away from those discussions and, instead, offered the Relator a role in a new group he was assembling to perform organizational analysis and teach executive leadership. Although he attempted to do so, the Relator could never get an explanation for why the position in the finance role was withdrawn, even though the Relator was amply qualified for this role.

46.     About this same time, the Relator had a strong interview with Tom Culligan and John Krysiak for the position of Chief Financial Officer of Raytheon's Arlington, Virginia office. Mr. Krysiak informed Mr. Dyer that he should be the one selected because he was the right choice for the job. Nevertheless, Mr. Dyer was not selected and he was left with no further choice but to accept a position outside of corporate finance with Mr. Ronchi's newly formed learning organization or to leave Raytheon.

47.     Because he wanted to work in corporate finance, the Relator continued his efforts to return to that department over the next several years. For example, during 2004, the Relator contacted Lou LaRoche, the Chief Financial Officer of the RTSC business unit, about a Director of Finance role in the Burlington, Massachusetts office of that business unit. Mr. LaRoche responded very encouragingly and said that he would like to set up a call with the Relator to explore the opportunity. Nevertheless, Mr. LaRoche failed to return voicemails and e-mails from the Relator concerning the position.

48.     Thereafter, the Relator sent a note to Judy Durkin, at this time now VP of Financial Planning and Analysis, in order to inquire about a position as a Director of Financial Benchmarking and Metrics that she had posted internally. Ms. Durkin responded that Defendant was looking for someone outside Raytheon but, if Defendant decided to consider internal

13

candidates, she would contact the Relator. There was no further response from Ms. Durkin. Ms. Durkin's explanation for her refusal to consider the Relator was a pretext for the retaliation for his raising concerns with senior management about false claims and other unlawful activity in the C3I business unit.

49.     From approximately April 2003 to December 2006, the Relator performed well in his role, leadership development and organizational network analysis. He received excellent performance reviews as well as excellent student evaluations for the executive leadership classes that he facilitated.

50.     During October 2007, the Relator was informed that there was not enough business to support him.

51     During October 2007, the Relator attempted to contact Rich Goglia, Vice President and Treasurer, about an open position in the Corporate Strategic Planning Group. The Relator had worked well with Mr. Goglia in the past and they were on friendly terms. After the Relator expressed interest in the position, Mr. Goglia refused to acknowledge his e-mail and literally avoided speaking to the Relator for weeks when they would see each other in the Defendant's corporate fitness facility.

52.     During November 2007, Defendant terminated the Relator's employment.

53.     In addition to the positions referenced above, the Relator has responded to at least half a dozen finance positions listed in Defendant's internal posting system. He has not received any confirmation or interest about any of them from the hiring managers. Given the Relator's extraordinary track record of accomplishments and history of excellent performance reviews, as well as the significant (approximately $1 Billion) savings he created for Defendant by designing

14

and implementing the RWIP, he was well qualified for many of the open positions for which he applied.

54.     The Relator's complaints to senior management about the FCA violations decimated his employment prospects with Defendant. The Relator has been blacklisted, his calls not returned and his emails ignored, all in retaliation for his bringing these false claims and unlawful acts to the attention of Defendant's senior management.

55.     During Plan Years 2002 to 2005, the RWIP was rolled into the ongoing Results Based Incentive Plan ("RBI"). During the relevant time period, the RBI was a broadbased executive incentive plan for approximately 7,500 Raytheon executives. For Plan Years 2002 to 2005, the RBI was made up of five metrics, as follows: (1) sales; (2) new bookings; (3) profit; (4) cash flow; and (5) working capital turnover. The working capital turnover metric comprised 20% of the overall bonus calculation for the RBI during these Plan Years. The RBI consisted of approximately $300 Million in incentive payouts during plan years 2002 through 2005. Each of the five metrics described above were individually evaluated and it was possible for an RBI participant to achieve greater than 100% credit for a particular metric, and as much as 150% of each of the five bonus categories.

56.     On information and belief, certain Raytheon executives and managers may have manipulated the working capital turnover metric in order to increase the size of their payment under the RBI. As such, Defendant may have submitted false claims to the Government and otherwise violated the FCA.

57.     Although Raytheon senior management was aware of the fraudulent and unlawful conduct of Messrs. Farnsworth, Noyes and McCauley, Defendant took no meaningful action to investigate and/or remediate the situation. In fact, Mr. Farnsworth was promoted to the role of

15

Chief Financial Officer of the RTSC business; Mr. Noyes was promoted to the role of Director, Financial Planning; and Ms. Durkin, who was aware of the fraud and failed to raise it with senior management, was made a Vice President; Ed Pliner, formerly the Corporate Controller during the relevant time period, was promoted to the role of Chief Financial Officer and Keith Peden, formerly Vice President of Human Resources – Compensation and Benefits, was promoted to the role of Senior Vice President of Human Resources. Raytheon failed to investigate or take any disciplinary action against any of neither the conspirators nor any of the managers who were aware of the FCA violations.

## VI.   **LEGAL CLAIMS FOR RELIEF**

58.   Relator alleges that Defendant's conduct detailed above violates the FCA, 31 U.S.C. §§ 3729-3733, as amended (Counts One through Four); for violation of the terms of defense contracting programs (Count Five), and he brings these claims on behalf of the Government as well as on his own behalf. In addition, he brings a personal claim against Defendant for retaliating against him in violation of 31 U.S.C. § 3730(h) (Count Six).

### COUNT ONE

### [False and/or Fraudulent Claims, 31 U.S.C. § 3729 (a)(1)]

59.   Relator restates and realleges the allegations in paragraphs 1 through 58 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

60.   This is a claim for treble damages and monetary penalties pursuant to the FCA, 31 U.S.C. §§ 3729-3733, as amended.

16

61. Through the above-described acts and omissions, and from at least March 4, 2002, the Defendant knowingly caused to be presented for payment and approval false and/or fraudulent claims to officers of the Government.

62. Federal defense contracting program officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment that should not have been paid or approved.

63. The Defendant, through the means described above, deliberately and intentionally concealed the false and fraudulent nature of the claims from officials with Government defense contracting programs, and other Government officials, their contractors and agents, in order to induce payment of the false and fraudulent claims.

64. Government defense contracting program officials and their contractors and agents, would not have paid the claims had they known the truth.

65. By reason of the above-described presentment of false and fraudulent claims by Raytheon, the Government has suffered significant losses in an amount to be determined.

## COUNT TWO

### [False Records and Statements, 31 U.S.C. § 3729 (a)(2)]

66. Relator restates and realleges the allegations in paragraphs 1 through 65 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

67. This is a claim for treble damages and monetary penalties pursuant to the FCA, 31 U.S.C. §§ 3729-3733, as amended.

68. Through the above-described acts and omissions, and from at least March 4, 2002, the Defendant knowingly made and used, and caused to be made and used, false records

17

and statements for the purpose of having false and fraudulent claims paid and approved by federal defense contracting program officials, their contractors and agents. As a result of this illegal activity, these claims were improper pursuant to 31 U.S.C. § 3729(a)(2).

69. By reason of the above-described presentment of false records and statements, the Government has suffered significant losses in an amount to be determined.

## COUNT THREE

### [Conspiracy to Defraud, 31 U.S.C. § 3729 (a)(3)]

70. Relator restates and realleges the allegations in paragraphs 1 through 69 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

71. This is a claim for treble damages and monetary penalties pursuant to the FCA, 31 U.S.C. §§ 3729-3733, as amended.

72. Through the above-described acts and omissions, and from at least March 4, 2002 to the present, the Defendant, with persons known and unknown, knowingly agreed and conspired to defraud the Government by having false and fraudulent claims paid and approved by federal defense contracting program officials, their contractors, and agents. As a result of this illegal activity, these claims were improper pursuant to 31 U.S.C. § 3729(a)(1)-(2).

73. By reason of the above-described unlawful conspiracy, the Government has suffered significant losses in an amount to be determined.

18

## COUNT FOUR

### [False Statements to Conceal Obligations, 31 U.S.C. § 3729(a)(7)]

74.    Relator restates and realleges the allegations in paragraphs 1 through 73 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference

75.    This is a claim for treble damages and monetary penalties pursuant to the FCA, 31 U.S.C. §§ 3729-3733, as amended.

76.    Through the above-described acts and omissions, the Defendant knowingly made and used, and/or caused to be made and used, false records and statements regarding the RWIP in order to conceal the Defendant's fraudulent conduct, avoid and/or decrease the Defendant's obligations to pay or transmit monies or to offer certain prices to Government defense contracting programs to the United States. Claims to Government defense contracting programs as described above were false or fraudulent and the statements and records were false.

77.    By reason of the above-described false records and statements, the Government has suffered significant losses in an amount to be determined.

## COUNT FIVE

### [Violation of Government Defense Contract Programs]

78    Relator restates and realleges the allegations in paragraphs 1 through 77 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

79.    The above-described practices by Defendant have caused the submission of false and fraudulent claims to Government defense contracting programs for reimbursement of

19

overhead for Defendant's employees. Claims related to such submissions have contained false and fraudulent statements and material omissions.

80. Government programs have been damaged significantly because of Defendant's illegal acts in an amount to be determined.

## COUNT SIX

### [Defendant's Unlawful Retaliation Against Relator: 31 U.S.C. section 3730(h)]

81. Relator restates and realleges the allegations in paragraphs 1 through 80 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

81. Raytheon threatened, harassed and otherwise discriminated against the Relator because of his lawful acts involving potential violation(s) of the FCA by his employer, Raytheon. By these actions, Defendant violated the FCA, 31 U.S.C. section 3730(h).

82. Relator has been damaged as a direct result of these illegal actions. He has suffered great economic harm, loss of income, and emotional injury.

## PRAYERS FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against the Defendant, as follows:

1. That Defendant ceases and desists from violating 31 U.S.C. § 3729 et seq.,

2. That this Court enters judgment against Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a maximum civil penalty of $11,000 for each false claim;

20

3.      That Relator be awarded the maximum amount allowed to him as Relator's share pursuant to § 3730(d), and for reasonable expenses, attorneys' fees, costs and expenses incurred by Relator;

4.      That the Defendant be required to disgorge the profits earned by Defendant as a result of its illegal scheme;

5.      That the Court grants permanent injunctive relief to prevent any recurrence of the FCA violations for which redress is sought in this Complaint;

6.      For Count Six, that Relator be granted all relief necessary to make him whole, including but not limited to two times his back pay plus interest (and prejudgment interest); reinstatement or in lieu thereof, front pay, and other compensatory damages sustained as a result of Defendant's violation of 31 U.S.C. §3730(h); and his attorneys' fees, costs and expenses; and

7.      For such other relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Relator hereby demands a trial by jury on behalf of himself and the United States.

Respectfully submitted,

ROBERT J. DYER, *PRO SE*
5 Hugh Hill Lane
Beverly, MA 01915
(978) 927-1565
lilyjay@comcast.net

21