UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ROBERT J. DYER )<br>)<br>) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 08-10341-DPW |
| ) | |
| RAYTHEON COMPANY, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER
July 29, 2011

Relator Robert J. Dyer brought this *qui tam* action on behalf of the United States of America (the "Government") against Defendant Raytheon Company ("Raytheon" or the "Company"), alleging that Raytheon knowingly and intentionally made false statements in violation of the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729 *et seq.,* and wrongfully terminated him in violation of the FCA anti-retaliation provision, 31 U.S.C. § 3730(h). Following the Government's election not to intervene, Raytheon moved to dismiss all of Dyer's claims. For the reasons discussed below, I will deny Raytheon's motion to dismiss as to the FCA claims but will grant that motion as to the retaliation claim.

## I. BACKGROUND

### A. *Factual Background*

The allegations contained in the Verified Amended Complaint are read in the light most favorable to Dyer, the non-moving party.

### 1. The Development of the Company's Working Capital Incentive Program

In February 2000, Dyer was hired by Frank Caine, Chief Financial Officer at Raytheon, as the Senior Manager of Financial Analysis in the Corporate Finance Group. (V. Am. Compl. ¶¶ 15-16.) In this capacity, Dyer was in charge of developing a special enterprise level working program known as Raytheon Working Capital Incentive Program (the "RWCIP"). (*Id.* ¶ 18.) The objective of the RWCIP was to provide an incentive for Raytheon's business executives and managers to make operational and process improvements in daily operations resulting in increased cash flow, reduction of debt, and interest expense. (*Id.*)

In March 2001, Frank Caine and Keith Peden, Vice President of Human Resources, presented the RWCIP to Raytheon's Board of Directors (the "Board"). (*Id.* ¶ 23.) During this presentation, Caine and Peden informed the Board that "only operational and process improvements which resulted in the actual production of cash value would be counted toward achievement of the RW[C]IP

targets." (*Id.*)  They also stated that the RWCIP would be self-funded, meaning that any incentive bonuses would be funded exclusively by working capital savings. (*Id.*)  Based on these representations, the Board approved the RWCIP for approximately 2,000 executives in relevant business units; with each unit being required to achieve a 0.6 turn improvement in working capital turnover. (*Id.* ¶ 21.)

Following the approval of the RWCIP by the Board, the Company prepared documentation to explain to its employees the purpose and the rules applicable to this program.  In this connection, the 2001 Company's Working Capital Incentive Plan brochure stated:

> We are targeting to remove approximately $470 Million in working capital and save approximately $33 Million in interest. This is where your payout comes from: as we improve our efficiency, a portion of the interest savings will be used to reward the participants who have achieved this goal.

(*Id.* ¶ 25; Ex. 34-3.)  In addition, a presentation made by Dyer was distributed to the relevant business units explaining them that "[g]round rules establish that operational and process improvements count toward target achievement." (*Id.* ¶ 26; Ex. 34-4 at 10.)

In August 2001, Dyer and Gary McCauley, Raytheon's Vice President for Financial Analysis, met with Herb Homer, the Officer at the Defense Contract Audit Agency ("DCAA") in charge of Raytheon, to present an overview of the RWCIP. (*Id.* ¶ 27.)

During this presentation, Dyer and McCauley explained that the RWCIP would not only benefit Raytheon but also the Government by maximizing efficiencies on the various contracts the Company had with the Government. (*Id.* ¶ 28.) The rules applicable to this program were, as explained to Homer, that "only real improvements resulting in working capital savings and cash production would be counted toward the RWCIP and that accounting reclassifications would not be considered for purposes of target achievement goals and incentive bonuses." (*Id.* ¶ 27.) Following this meeting, Raytheon obtained approval from Homer on behalf of the DCAA to charge the Government for the RWCIP compensation bonuses, which were to be charged as "Allowable Costs" for reimbursement as part of the "Overhead Charges" submitted to the Government. (*Id.*) Accordingly, the RWCIP was approved not only by the Board, but also by the Government. (*Id.* ¶ 29.)

2. <u>The C3I Business Unit and Relevant Accounting Reclassifications</u>

During the same time period, Frank Marchilena, President of Raytheon's Command Control Communication and Information Systems ("C3I") business unit, sent a letter to C3I participants explaining what Dyer characterizes as "ground rules" and parameters of the RWCIP as follows:

> This program is targeted to select individuals who can dramatically impact our capital performance. Working capital is a measure of the amount of investment we have in our business. The more efficient we can be at running our business the lower our working capital and the more cash we can generate to pay down our debt.

(*Id.* ¶ 31; Ex. 34-7.)  Further to this communication, Dyer sent an email to the chief financial officers of all relevant business units on November 30, 2001 to inquire about accounting reclassifications related to the RWCIP for the Plan Year 2001. (V. Am. Compl. ¶ 32.)  In that email, Dyer mentioned that all accounting reclassifications were to be excluded from the measurement of working capital turnover for RWCIP purposes:

> You will remember back to the inception of the working capital incentive program a set of ground rules that stated only process improvements would count toward goal achievement.  As a housekeeping item related to calculating the actual 2001 working capital turnover performance will be to identify and *exclude any reclassifications made between working capital accounts and other balance sheet accounts during 2001.*

(*Id.*; Ex. 34-8 (emphasis added).)

Duncan Noyes, Manager of Budget and Planning of the C3I business unit, responded to Dyer's request on December 17, 2001 by reporting two minor accounting reclassifications and one allegedly "worth a few Million $."  (V. Am. Compl. ¶ 34; Ex. 34-9.)  Shortly thereafter, Judy Durkin, Corporate Director of Financial Planning and Analysis at Raytheon, met with Dyer to discuss Noyes' December 17 email.  (*Id.* ¶ 35.)  During this meeting, Durkin told Dyer that the significant accounting reclassification mentioned in that email had not been made in accordance with the RWCIP and therefore needed to be removed from the C3I business unit working capital turnover measurement.  (*Id.* ¶ 36.)

Consistent with the position adopted by Durkin, Dyer sent an email to Noyes on December 19, 2001 reaffirming that the "ground rules" prohibited the inclusion of any accounting reclassifications for RWCIP purposes. (*Id.* ¶ 37; Ex. 34-10.) Noyes and David Farnsworth, Chief Financial Officer of the C3I business unit, sent further details on December 21, 2001 to Dyer regarding the two previously disclosed minor accounting reclassifications but failed to mention the more significant reclassification referenced in Noyes' December 17 response. (V. Am. Compl. ¶ 39.)  At that time, Dyer decided to forward the December 21 response to McCauley, his manager, along with a note explaining that the Controller's group had informed him of "another significant ($20+ million) reclassification entry that should be adjusted for." (*Id.* ¶ 40; Ex. 34-13.)  Dyer then asked Farnsworth to confirm the absence of any entries other than the two referenced minor reclassifications which would impact the measurement of C3I working capital turnover. (V. Am. Compl. ¶ 41; Ex. 34-14.)  Farnsworth expressly "confirmed" on the same day that none existed. (V. Am. Compl. ¶ 42; Ex. 34-15.)

The Corporate Accounting Department at Raytheon reported on January 3, 2002 that a $23.7[1] million reclassification in

---

[1]  The amount of the accounting reclassification specified for the Space Imaging Joint Venture Project varies in the attachments to the Verified Amended Complaint.  *Compare* (Ex. 34-16.) (indicating $25.7 million) *with* (Ex. 34-17.) (indicating $23,715,105).  For purposes of this Memorandum and Order, I will deem the accounting reclassification to be in the amount of $23.7

relation to its Space Imaging Joint Venture Project (the "Space Imaging reclassification") had been made in January 2001 by the C3I business unit. (*Id.* ¶ 43; Ex. 34-16.) In essence, the C3I business unit had moved the Space Imaging reclassification from a short term to a long-term receivable position. (*Id.* ¶ 45.) Upon learning this information, Dyer attempted to contact McCauley on numerous occasions to express concern. (*Id.* ¶ 47.) Dyer managed to speak with McCauley on January 4, 2002 and inform him that the Space Imaging reclassification was fraudulent. (*Id.* ¶ 48.) Because McCauley took no action, Dyer decided to relay his concerns to Ed Pliner, Corporate Controller at Raytheon, who responded that there was no intention "to hide the ball." (*Id.* ¶ 49.) Dyer received a call from McCauley shortly thereafter, instructing him that "the issue was done." (*Id.* ¶ 50.) Dyer understood McCauley's instruction to mean that, if he continued to investigate the matter, he would be terminated. (*Id.*)

A few days later, McCauley contacted Dyer to ask him whether he was aware of any standard practice for making adjustments for the minor reclassifications that the C3I business unit had disclosed. (*Id.* ¶ 51.) Dyer replied that no such practice was in place but nevertheless explained how to make the adjustment. (*Id.*) Dyer also seized the occasion to remind McCauley that the same treatment should be applied to the Space Imaging

million as stated in the text of the Verified Amended Complaint. (*See e.g.*, V. Am. Compl. ¶ 43.)

reclassification. (*Id.*) McCauley responded "[l]et's focus on demos and upstream [the two minor reclassifications] and get agreement on their impact. [Space Imaging] is in a different category." (*Id.*; Ex. 34-22; Ex. 34-23.) McCauley subsequently informed Dyer that the Space Imaging reclassification would be allowed to count as a real improvement for RWCIP purposes. (V. Am. Compl. ¶ 52.)

During the week that followed, Dyer prepared a "Final 2001 Performance Appraisal" for the C3I business unit, which initially included the following language:

> The reported results included here have been adjusted to negate the impact of two accounting reclassifications that improved working capital. The impact these adjustments had on the results reports were as follows:
>
>       Demonstrator Capitalization.............0.02 turns
>       Upstream Info Receivable Reclass........0.01 turns
>
> The results have not been adjusted to negate for a $23.7 million reclass [*sic*] of short term receivable to the long-term asset account. This receivable balance arose from transactions between C3I and the Raytheon joint venture Space Imaging, which determined at the end of 2000, that it did not have adequate cash flow to make payment to C3I. Since the payment (or non-payment) was viewed as a matter of Raytheon's financing convenience, C3I was allowed to reclassify the amount as if the amount had indeed been collected. This reclassification improved C3I's turnover performance by .2 turns.

(*Id.* ¶ 53; Ex. 34-25.) The language relating to the Space Imaging reclassification was, however, removed by McCauley from the report prior to circulation to Raytheon's senior management. (V. Am. Compl. ¶ 54.)

8

The total incentive bonus payout to C3I business managers for the Plan Year 2001 was approximately $3.4 million, including $219,000 paid to Marchilena and $95,000 paid to Farnsworth.[2] (*Id.* ¶¶ 46, 57.) The inclusion of the Space Imaging reclassification accounted for 33%, or approximately $1.165 million, of that amount. (*Id.* ¶ 44.) The total incentive bonus payout was allegedly billed and charged by the Company as "Allowable Costs" for reimbursement as part of "Overhead Charges" submitted to the Government and spread over "numerous contracts by and between the Defendant Raytheon and the Government." (*Id.* ¶ 59.)

### 3. Dyer's Employment History With the Company

During his tenure as Senior Manager of Financial Analysis, Dyer obtained strong evaluation and performance reviews. A January 2001 Performance and Development Summary rated Dyer's overall performance as "[c]onsistently exceed[ing] performance requirements in the quality, timeliness and quantity of work completed." (*Id.* ¶ 62.) Likewise, a 2002 Performance and Development Summary (presumably developed early that year) provided that "Jay's leadership and strategies have now proven to have reduced working capital on the defense Company's balance sheet by $1.3 B. This dramatic improvement enabled Raytheon to

---

[2] The Verified Amended Complaint contains no allegation as to whether McCauley received any incentive bonus for the Plan Year 2001.

weather a dramatic downturn in the commercial markets." (*Id.* ¶ 63.)

Despite these positive evaluations, McCauley informed Dyer, during his spring 2002 review, that Farnsworth had recommended terminating him. (*Id.* ¶ 64.) Several months later, the corporate analysis department was reorganized. (*Id.* ¶ 65.) As part of this reorganization, McCauley was replaced as Vice President of Finance and Noyes was appointed to take over his role as Senior Manager of Financial Analysis. (*Id.*) Dyer contends that his removal from his corporate finance position was due to his persistent efforts to warn the senior management about the alleged fraudulent inclusion of the Space Imaging reclassification. (*Id.* ¶ 76.)

Following his removal as Senior Manager of Financial Analysis, Dyer unsuccessfully sought other positions within the Company's corporate finance group. (*Id.* ¶ 66.) He first applied for a position as Chief Financial Officer, but instead was offered the opportunity to join a newly-created group designed to perform organizational analysis and teach executive leadership. (*Id.* ¶ 67.) Fearing that he would be unable to obtain a position in the Company's corporate finance group, Dyer accepted that offer, while continuing to apply for other finance-related positions. (*Id.* ¶ 68.)

Although Dyer received excellent performance reviews for his role in leadership from April 2003 to December 2006,[3] he was informed in October 2007 that "there was not enough business to support his position." (*Id.* ¶ 72.) At that time, Dyer contacted Rich Goglia, Vice President and Treasurer, to inquire about a position in Raytheon's Corporate Strategic Planning Group, but Goglia allegedly refused to acknowledge his email and avoided speaking to him. (*Id.* ¶ 73.) Dyer also applied for at least six finance positions listed in the Company's internal posting system but never received any response. (*Id.* ¶ 74.) Dyer was eventually terminated in November 2007. (*Id.* ¶ 75.)

To explain his inability to secure another position within the Company, Dyer claims that he had been "blacklisted" because of his attempts to bring fraudulent conduct to the attention of the senior management. (*Id.* ¶ 76.) Prior to these attempts, Dyer was considered "a rising star" in the Company's financial group on track to becoming a Vice President. (*Id.*) Afterwards, he was "shunned, ignored and placed upon a desolate corporate island as a pariah with no opportunity for professional advancement." (*Id.*) Since his termination, Dyer has been unable to obtain a permanent corporate finance position with another

---

[3] While Dyer was not terminated until November 2007, the Verified Amended Complaint contains no information regarding his performance between December 2006 and November 2007.

company "due to actions taken by Raytheon employees to disparage him professionally." (*Id.* ¶¶ 77-79.)

**B.    *Procedural Background***

Dyer commenced the instant litigation on March 3, 2008 by filing under seal a six-count complaint, alleging that the Company had knowingly presented a false or fraudulent claim for payment by the Government under 31 U.S.C. § 3729(a)(1) (Count I), used a false record or statement to get a false or fraudulent claim paid by the Government under 31 U.S.C. § 3729(a)(2) (Count II), conspired to defraud the Government by getting a false claim paid under 31 U.S.C. § 3729(a)(3) (Count III), made false statements to conceal certain obligations under 31 U.S.C. § 3729(a)(7) (Count IV), violated government defense contract programs (Count V), and wrongfully retaliated against him under 31 U.S.C. § 3730(h) (Count VI).

After receiving several extensions of the sealing order in order to permit consideration of intervention, the Government gave notice that it declined to intervene at this time. Accordingly, I unsealed the matter on February 19, 2010. Thereafter, Defendant moved to dismiss all claims asserted in the complaint for failure to allege actionable conduct under the FCA and failure to plead fraud and conspiracy with particularity as required under Federal Rule of Civil Procedure 9(b).

At a hearing held before me on May 18, 2010, I allowed Dyer's voluntary dismissal of Counts III, IV, and V of the

complaint and provided him with the opportunity to re-plead the remaining counts, while cautioning Dyer that, in order to make viable FCA claims, he was required to identify "obligations that are enforceable or misrepresentations that are enforceable or that the Government relied upon."

Following that hearing, Dyer filed the Verified Amended Complaint on June 15, 2010, alleging that Defendant made false or fraudulent claims to the Government under 31 U.S.C. § 3729(a)(1)(A) (Count I), made false records or statements to get false or fraudulent claims paid or approved by the Government under 31 U.S.C. § 3729(a)(1)(B) (Count II) and wrongfully retaliated against him under 31 U.S.C. § 3730(h) (Count III).

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts, accepted a true, "to state a claim to relief that it plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Traditionally, the rules of pleading require no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, where, as here, allegations of fraud are made, the complaint must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires "stat[ing] with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *United States ex rel. Gagne v. City of Worcester*, 565 F.3d

13

40, 45 (1st Cir. 2009) ("the heightened pleading requirements of FED. R. CIV. P. 9(b) apply to claims brought under subsection (a)(1) of the FCA, and subsection (a)(2)" (internal citations omitted)).

Under Rule 9(b), the "requirement that averments of fraud be stated with particularity – specifying the 'time, place, and content' of the alleged false or fraudulent representations, means that a relator must provide details that identify particular false claims for payment that were submitted to the government." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004). "The rule may be satisfied, however, 'where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA.'" *Gagne*, 565 F.3d at 45 (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720 (1st Cir. 2007)).

## III.  DISCUSSION

### A.  *False Claims (Counts I & II)*

Dyer argues that the inclusion of the Space Imaging reclassification as a real improvement for RWCIP purposes caused false or fraudulent claims to be submitted to the Government in

14

violation of 31 U.S.C. §§ 3729(a)(1) and (2).[4] (V. Am. Compl. ¶¶ 48, 53, 60, 91, 97.)

Subsection 3729(a)(1) imposes liability on a person who "knowingly presents, or causes to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), whereas subsection 3729(a)(2) renders liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2). "While § 3729(a)(1) requires a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government, the concept of presentment is not mentioned in § 3729(a)(2)."[5] *Allison Engine, Inc. v. United*

---

[4] In May 2009, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), amending the subsections of § 3729(a). The modifications included renumbering § 3729(a)(1) and § 3729(a)(2) as § 3729(a)(1)(A) and § 3729(a)(1)(B) respectively, and adding language to the new provisions "to correct erroneous interpretations of the law." S. REP. No. 111-10, at 10 (2009). Although Congress stated that certain modifications would apply to "all claims under the False Claims Act . . . that are pending on or after [June 7, 2008]," 123 Stat. 1625, I need not determine in this case which of the pre- or post-FERA versions of the FCA governs at this stage because neither party has raised the issue and any potentially applicable version would appear to generate the same outcome. For consistency and to avoid any confusion, I will refer in this Memorandum to the pre-FERA version of subsections, § 3729(a)(1) and § 3729(a)(2).

[5] Because the parties do not rely upon any distinctions between the requirements of § 3729(a)(1) and § 3729(a)(2) in connection with the motion to dismiss, I will treat the relevant statutory requirements as the same for both provisions.

*States ex rel. Sanders*, 553 U.S. 662, 671 (2008). For purposes of both subsections, "[a] person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'" *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, --- F.3d ----, 2011 WL 2150191, at *2 (1st Cir. June 1, 2011) (quoting 42 U.S.C. § 3729(b)).

Defendant's motion to dismiss the Verified Amended Complaint focuses on the absence of specific allegations of false claims submitted to the Government. In particular, Defendant contends that Dyer's allegations (1) fail to establish a nexus between any alleged falsehood and a contract with the Government, (2) are insufficient to constitute an objective falsehood under the FCA, and otherwise (3) fail to pass muster under the heightened standard of Rule 9(b).

### 1. Existence of a Nexus Between Falsehood and Contract with the Government

Defendant first argues that Dyer's failure to allege the existence of a particular contract between the Company and the Government or the performance of government work by the C3I business unit is fatal to his FCA claims. I disagree.

As a threshold matter, an FCA violation may originate not only from a contract, but also from any other applicable statute or regulation. *See* S. REP. No. 99-345 at 9 (1986), *reprinted in*

16

1986 U.S.C.C.A.N. 5266, 5274 ("[E]ach and every claim submitted under a contract, . . . or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."); *see also United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674 (5th Cir. 2003) ("whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it."). The rationale is that the False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968); *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006) ("All that matters is whether the false statement or course of conduct causes the government to pay out money or to forfeit moneys.") (internal citations and quotation marks omitted).

In the Verified Amended Complaint, Dyer relies upon several Federal Acquisitions Regulations ("FAR") to establish that Defendant owed a duty to exclude the Space Imaging reclassification from the measurement of working capital turnover. (V. Am. Compl. ¶¶ 80-99.) In particular, Dyer contends that, in refusing to do so, Defendant knowingly violated 48 C.F.R. § 31.205-6(a), which limits the allocability of

compensation for personal services[6] as follows:

> (a) General. Compensation for personal services is allowable subject to the following general criteria and additional requirements contained in other parts of this cost principle:
>
> . . . .
>
> (3) The compensation must be based upon and conform to the terms and conditions of the *contractor's established compensation plan* or practice followed so consistently as to imply, in effect, an agreement to make the payment.
>
> (4) No presumption of allowability will exist where the contractor introduces major revisions of existing compensation plans or new plans and the contractor has not provided the cognizant ACO [Administrative Contracting Officer], either before implementation or within a reasonable period after it, an opportunity to review the allowability of the changes.

48 C.F.R. § 31.205-6(a)(3) and (4) (emphasis added). In addition, Dyer contends that Defendant knowingly violated 48 C.F.R. § 31.205-6(f)(1), which provides that bonuses and incentive compensation are allowable costs only to the extent that the following criteria are satisfied:

> Bonuses and incentive compensation are allowable provided the –
>
> (i) Awards are paid or accrued under an agreement entered into in good faith between the contractor and the employees before the services are rendered or pursuant to an *established plan or policy* followed by the contractor so consistently as to imply, in effect, an agreement to make such payment; and
>
> (ii) Basis for the award is supported.

---

[6] The term "Compensation for personal services" is defined as "work performed by the employee in the current year," exclusive of any "retroactive adjustment of prior years' salaries or wages." 48 C.F.R. § 31.205-6(a)(1).

48 C.F.R. § 31.205-6(f)(1) (emphasis added).

To bolster his FCA claim, Dyer also relies on more general provisions of the FAR regarding the reasonableness of costs, 48 C.F.R. § 31.201-3(a), and the allocability of such costs, 48 C.F.R. § 31.201-4. For instance, 48 C.F.R. § 31.201-3(a) provides that "[a] cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." For its part, 48 C.F.R. § 31.201-4 imposes the following restrictions on cost allowability:

> A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it--
>
> (a) Is incurred specifically for the contract;
>
> (b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or
>
> (c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

48 C.F.R. § 31.201-4.

The scope of the FAR relied upon by Dyer encompasses "cost principles and procedures for (a) the pricing of contracts, subcontracts, and modifications to contracts and subcontracts whenever cost analysis is performed . . . and (b) the determination, negotiation, or allowance of costs when required

19

by a contract clause." 48 C.F.R. § 31.000. The application of such provisions requires the existence of a contract with the Government, which defines the terms and conditions regarding the allowance of costs. *See* 48 C.F.R. § 31.201-2 (requiring the allowability of costs to comply with the "[t]erms of the contract"); 48 C.F.R. § 31.201-4 (discussing the allowability of costs "to a Government contract"). However, Dyer does not allege any specific contracts between C3I - the only business unit involved in the Space Imagining reclassification - and the Government, nor does he specifically allege that this business unit did any work for the Government. Instead, Dyer contends conclusorily that "numerous contracts by and between the Defendant Raytheon and the Government" exist. (V. Am. Compl. ¶¶ 11, 28, 59, 82.)

Nevertheless, I find that, at this stage of the proceeding, Dyer's failure to identify *specific* contracts justifying the application of the FAR is not fatal to his FCA claims. As Chief Judge Easterbrook observed in a somewhat different context, "[a] relator need not have seen the claims submitted to the federal government, but must know enough to make fraud a likely explanation for any overbilling." *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 870 (7th Cir. 2011) (citations omitted); *see also United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) ("Plaintiffs were not required to prove their case in the complaint," but only "needed

to give enough facts to show that relief was plausible.").  The
alleged discussion between Dyer, McCauley, and Homer of the
Defense Contract Audit Agency about the RWCIP would have been an
idle conversation if there were no contracts for which claims
were anticipated.  For this reason, I conclude that the existence
of government contracts upon which false claims were allegedly
based is plausible and that discovery to provide greater details
is appropriate.[7]

### 2.   Existence of a False or Fraudulent Claim

Raytheon's second argument is that, even assuming that Dyer
has sufficiently plead the existence of government contracts, the
Verified Amended Complaint nevertheless fails to establish an
actionable  false and fraudulent claim.

The First Circuit has recently reaffirmed that satisfaction
of this element requires a showing that compliance with the
underlying contract, statute or regulation, constitutes a
"precondition of payment" by the Government "that had not been
met." *Hutcheson,* 2011 WL 2150191, at *13.  The court has,
however, rejected certain conceptual distinctions adopted by
other circuits between (1) legal and factual falsity and (2)

---

[7]  I note that Raytheon has declined my invitation to permit
a brief period of initial discovery in connection with this
motion to dismiss to determine the existence of any relevant
government contracts.

express and implied certification,[8] finding that "these categories may do more to obscure than to clarify the issues" arising in the context of FCA cases. *Id.* at *6-7. The inquiry involved in determining the existence of an actionable false or fraudulent claim is "fact-intensive and context-specific." *New York v. Amgen, Inc.*, No. 10-1629, --- F.3d ----, 2011293742, at *6 (1st Cir. July 22, 2011).

The question whether compliance with the FAR was an unsatisfied precondition of the bonus payments raises two separate issues. The *first* is whether the text of the FAR relied upon by Dyer require the government contractor to comply in order to be paid. In the Verified Amended Complaint, Dyer relies principally on two sets of regulations.[9] Under 48 C.F.R. 31.205-6(a)(3), "[c]ompensation for personal services is allowable

---

[8] These categorical distinctions have been adopted by at least four other circuits. *See, e.g., United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113-14 (2d Cir. 2010), *rev'd on other grounds*, --- U.S. ----, 131 S. Ct. 1885 (2011); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 996-98 (9th Cir. 2010); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167-69 (10th Cir. 2010); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441 (3d Cir. 2004).

[9] Dyer also relies on 48 C.F.R. § 31.201-3(a) regarding the reasonableness of costs ("A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."), as well as on 48 C.F.R. § 31.201-4 regarding the allocability of such costs ("A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship."). (V. Am. Compl. ¶¶ 93-94.) However, these provisions do *not* precondition payment upon compliance.

22

*subject to*" the fact that it is "based upon and conform to the terms and conditions of the contractor's established compensation plan." 48 C.F.R. 31.205-6(a)(3) (emphasis added). Under 48 C.F.R. 31.205-6(f), "[b]onuses and incentive compensation are allowable *provided*" that "[a]wards are paid or accrued . . . pursuant to an established plan." 48 C.F.R. 31.205-6(f) (emphasis added). Both regulations therefore suggest that the allocability of costs to be reimbursed by the Government is subject to compliance with the Company's established plan. Accordingly, I find that compliance is arguably a precondition to the bonus payments under the FAR.

The *second* issue pertinent to this analysis is whether the Company violated its established plan by including the Space Imaging reclassification as a real improvement for RWCIP purposes. Resolving this issue depends on whether the exclusion of accounting reclassification within the RWCIP was part of an "established compensation plan" within the meaning of 48 C.F.R. § 31.205-6(a) or an "established plan" within the meaning of 48 C.F.R. 31.205-6(f). Phrased differently, Dyer's FCA claims are contingent on whether the "ground rules" require that only operational and process improvements resulting in the production of "cash value" be counted as real improvement for RWCIP purposes. In this regard, the complaint states that the Board approved the RWCIP on the basis that "only operational and process improvements which resulted in the actual production of

*cash value* would be counted toward achievement of the RW[C]IP targets." (V. Am. Compl. ¶ 23 (emphasis added).) Consistent with this view, the complaint further alleges that the RWCIP was approved by Homer at the DCAA based on the representation that accounting reclassifications would be excluded. (*Id.* ¶ 27.) To establish the existence of such "ground rules," Dyer also relies on correspondence sent by him[10] internally. For instance, Dyer points to a November 30, 2001 email sent to the chief financial officers of the relevant business units reminding them that "any reclassifications made between working capital accounts and other balance sheet accounts during 2001" were to be excluded from the measurement of working capital turnover. (*Id.* ¶ 33; Ex. 34-8.) Next, Dyer points to a December 19, 2001 email sent to Noyes, in which Dyer stated that "any accounting reclassification which affects the 2000 baseline to the 2001 annual must be recognized." (*Id.* ¶ 37; Ex. 34-10.) As a result, I am satisfied that both the allegations made in the complaint, as well as the documentation relied upon by Dyer, establish in a plausible manner that the bonus payments were directly linked to the production of "cash value." It follows that the exclusion of accounting

---

[10] In an attempt to undermine the documentation relied upon by Dyer, Raytheon places great weight on the fact that this documentation was sent by Dyer *himself*, rather than by other employees at Raytheon. Given that the Verified Amended Complaint alleges that Dyer was directed to develop the RWCIP, it is neither surprising nor implausible that Dyer was the person informing Raytheon personnel regarding the rules applicable to this program.

reclassifications for RWCIP purposes was part of an "established compensation plan" within the meaning of 48 C.F.R. § 31.205-6(a) or an "established plan" within the meaning of 48 C.F.R. 31.205-6(f).

Given that compliance with the Company's established plan is a precondition to the bonus payments under the FAR and that the exclusion of accounting reclassifications was allegedly part of such an established plan, the submission of reimbursement claims for costs associated with the Space Imaging reclassification "represented that there had been compliance with a material precondition that had not been met." *Hutcheson,* 2011 WL 2150191, at *13. Accordingly, the allegations made in the Verified Amended Complaint are sufficient to state FCA claims under Rule 12(b)(6). *See Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 115 (2d Cir. 2010), *rev'd on other grounds*, --- U.S. ----, 131 S. Ct. 1885 (2011) (vacating and remanding dismissal of FCA claims, where government contractor had allegedly submitted bids and won government contracts without having complied with a statute that preconditioned payment); *see also Hendow*, 461 F.3d at 1174-77 (reversing dismissal of FCA claims, where defendant had allegedly made false promises to comply with an incentive compensation ban in order to obtain payment from the government).

3.   <u>Rule 9(b)</u>

Although Dyer has stated sufficient claims to pass muster under Rule 12(b)(6), he is also required to comply with Rule

9(b).  Under this rule, the Verified Amended Complaint needed to
"provide details that identify particular false claims for
payment that were submitted to the government."  *Karvelas*, 360
F.3d at 232.

The allegations made in the complaint are sufficient to
satisfy Rule 9(b)'s heightened pleading requirement.  *See
Envirocare*, 614 F.3d at 1172 ("claims under the FCA need only
show the specifics of a fraudulent scheme and provide an adequate
basis for a reasonable inference that false claims were submitted
as part of that scheme.").  First, the allegations made by Dyer
provide specific details about the nature of the charge, i.e.,
the inclusion of the Space Imaging reclassification in the
measurement of working capital turnover.  *See United States ex
rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir.
2009) ("a pleading [need only] show, in detail, the nature of the
charge.").  Next, Dyer provided sufficient details about the
fraudulent scheme, including the employees involved at Raytheon,
as well as his successive attempts to persuade Defendant not to
include the Space Imaging accounting reclassification as a real
improvement for RWCIP purposes.  (V. Am. Compl. ¶¶ 37-53, 98.)
*Cf. United States ex rel. Williams v. Martin-Baker Aircraft Co.,
Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (affirming dismissal
of FCA claims under Rule 9(b) where the complaint failed, among
others, "to identify with specificity who precisely was involved
in the fraudulent activity.").  He also provided sufficient

details and documentation to show that "ground rules" required
that accounting reclassifications be excluded for RWCIP purposes.
(*Id.* ¶¶ 23, 27, 33, 37.)  The complaint states that, despite
these rules, Defendant wrongfully billed the bonus compensation
related to the Space Imaging accounting reclassification as
"Allowable Costs" for reimbursement as part of the "Overhead
Charges." (*Id.* ¶¶ 59-60.)  The complaint also states that, as a
result of this scheme, the Government allegedly paid
"approximately $1.165 Million in false billing and overcharges."
(*Id.* ¶ 99.)

Given that Dyer has provided sufficient factual allegations
to demonstrate the viability of his FCA claims under Rule 9(b), I
will deny Defendant's motion to dismiss as to Counts I and II.
*See United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579
F.3d 13, 29-32 (1st Cir. 2009) (finding that allegations that do
more than "suggest fraud was possible . . . pass muster for
purposes of Rule 9(b)") (internal citation omitted); *Envirocare*,
614 F.3d at 1172 ("By providing these factual allegations in a
clear, organized, and relatively concise manner, Plaintiffs' FCA
claims appear to have complied with both the heightened pleading
requirements of Rule 9(b).").

## B.    *Retaliation Claim (Count III)*

The Verified Amended Complaint states that Defendant
wrongfully retaliated against Dyer after he raised concerns about
potential FCA violations associated with the inclusion of the

Space Imaging reclassification in violation of 31 U.S.C. §
3730(h).[11] (V. Am. Compl. ¶¶ 109-11.)

In order to encourage the filing of *qui tam* actions and
protect whistleblowers who disclose false or fraudulent claims,
the FCA imposes liability on employers who retaliate against
employees for engaging in conduct protected under the FCA. *See*
31 U.S.C. § 3730(h). Specifically, subsection 3730(h) of the FCA
provides, in relevant part, that:

> Any employee who is discharged, demoted, suspended,
> threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts
> done by the employee . . . in furtherance of an action
> under this section, including investigation for,
> initiation of, testimony for, or assistance in an action
> filed or to be filed under this section, shall be
> entitled to all relief necessary to make the employee
> whole.

31 U.S.C. § 3730(h). To prevail on a claim for retaliation under
the FCA, "a plaintiff must show that 1) the employee's conduct
was protected under the FCA; 2) the employer knew that the
employee was engaged in such conduct; and 3) the employer

---

[11] In addition to amending certain subsections of § 3729,
*see* Note 4 *supra,* FERA modified the language of § 3730(h) and
divided it into two subsections, § 3730(h)(1) and § 3730(h)(2).
123 Stat. 1624-25. More recently, the Dodd-Frank Wall Street
Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub.
L. No. 111-203, 124 Stat. 1376 (2010), amended subsections of
§ 3730(h) further, by refining its wording and adding a third
subsection as § 3730(h)(3), which will be discussed below. 124
Stat. 2079. Here again, I need not decide which version of §
3730(h) governs in the present case, because any differences
between the pre and post-amendment versions of § 3730(h) would
lead to the same result. To avoid any confusion, I refer to the
pre-amendment version of § 3730(h).

discharged or discriminated against the employee because of his or her protected conduct." *Karvelas*, 360 F.3d at 235.

The sole independent substantive argument[12] advanced by Defendant in favor of dismissal is that Dyer's retaliation claim is time barred. Because Congress had not specified the limitations period applicable to FCA retaliations claims, it has been the practice to "borrow the most closely analogous state time limit." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 419 (2005). In Massachusetts, the most closely analogous statutes of limitations are the state's personal injury catchall statute, which provides a limit of three years, MASS. GEN. LAWS ch. 260, § 2A, or the state's whistleblower statute, which provides a limit of two years, MASS. GEN. LAWS ch. 149, § 185. *Id.* at 419 n.3; *United*

---

[12] Defendant also suggests that it would be unnecessary to consider Dyer's retaliation claim if the underlying FCA action were to be dismissed. While this suggestion is inapplicable at this point because I decline to dismiss the FCA claims, I must note my fundamental disagreement with the suggestion made by Defendant. The mere fact that Dyer's false claims are dismissed is insufficient in itself to warrant a dismissal of his retaliation claim. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 (2005) ("A retaliation plaintiff, instead, need prove only that the defendant retaliated against him for engaging in 'lawful acts done . . . in furtherance of' an FCA 'action filed or to be filed,' § 3730(h), language that protects an employee's conduct *even if* the target of an investigation or action to be filed was innocent.") (emphasis added); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004) ("interpret[ing] 'conduct in furtherance of an action under the FCA' as conduct that *reasonably* could lead to a viable FCA action.") (emphasis added).

*States ex rel. Deering v. Physiotherapy Assocs., Inc.*, 601 F.
Supp. 2d 368, 372 (D. Mass. 2009) (same).

Congress has now enacted the Dodd-Frank Wall Street Reform
and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376
(2010), which amended § 3730(h) by adding a statute of
limitations for FCA retaliation claims. 124 Stat. 2079. As a
result, § 3730(h)(3) currently provides that "[a] civil action
under this subsection may not be brought more than 3 years after
the date when the retaliation occurred." 31 U.S.C. § 3730(h)(3).
There is, however, no need for me to embark on a discussion on
whether the new limitations period in the Dodd-Frank Act
applies[13] in this case, because application of the federal or a
state statute of limitations will lead to the same outcome.

Whether federal or state law provides the limitations
period, "[i]t is federal law, however, that determines when the
statute of limitations begins to run." *Gorelik v. Costin*, 605
F.3d 118, 121 (1st Cir. 2010). For retaliation actions, the

---

[13] To date, only three courts have addressed the
retroactivity question in this context. One declined to resolve
the issue. *Lindsay v. Technical Coll. Sys. of Ga.*, No. 09-2133,
2011 WL 1157456, at *6 (N.D. Ga. Mar. 29, 2011). The other two
present alternative perspectives. *Compare Saunders v. District
of Columbia*, No. 02-01803, --- F. Supp. 2d ----, 2011 WL 2176900,
at *3-4 (D. D.C. June 6, 2011) (suggesting, without deciding, the
retroactive application of the applicable statute of limitations
in the Dodd-Frank Act, noting "there is some reason to believe
that Congress' specification of [that statute] obviates the need
to resort to the 'borrowing' doctrine") *with Riddle v. DynCorp
Int'l Inc.*, 733 F. Supp. 2d 743, 747-48 (N.D. Tex. 2010) (holding
that the statutes of limitations contained in the Dodd-Frank Act
is "*not* retroactive").

limitations period generally "start[s] to run when the cause of action accrues – in retaliation actions, when the retaliatory action occurs."[14]  *Graham*, 545 U.S. at 419.  In this case, the core retaliatory actions occurred from late 2001 until early 2002, i.e., when Dyer was asked to step down from his position as Senior Manager of Financial Analysis, approximately six years before he filed his complaint, and well outside the limitations period.  The same is true for some of the alleged efforts made by the Company allegedly to "blacklist" Dyer, thereby preventing him from reintegrating the Company's corporate finance group.

To overcome this hurdle, Dyer argues that his claim is timely under the continuing violation doctrine.  The continuing violation doctrine allows, in appropriate circumstances, an employee to file suit based on events that occurred outside the applicable statute of limitations.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (discussing the continuing violation doctrine for Title VII claims); *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 942 (Mass. 2001) (applying the continuing violation doctrine to discrimination claims).  The First Circuit has reaffirmed, however, that "[a]lthough the name

---

[14]  The specific language provided in the relevant state statutes is alternatively "within three years next after the cause of action accrues," MASS. GEN. LAWS ch. 260, § 2A, or "within two years" of the violation, MASS. GEN. LAWS ch. 149, § 185.  This language is consistent with the new subsection of § 3730(h)(3), which provides that the clock starts ticking "when the retaliation occurred."  31 U.S.C. § 3730(h)(3).

of the doctrine may sound auspicious for late-filing plaintiffs, it does *not* allow a plaintiff to avoid filing suit so long as some person continues to violate [his] rights." *Gorelik*, 605 F.3d at 122 (quoting *Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008)). Rather, the purpose of this "doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Id.*

As an initial matter, the issue whether the continuing violation doctrine is applicable to FCA claims is apparently of first impression in the First Circuit.[15] While research has disclosed no other circuit court that has yet addressed the issue, two district courts have noted the lack of support for the applicability of that doctrine in this context. *See United States ex rel. Wynne v. Blue Cross and Blue Shield of Kan., Inc.*,

_____

[15] To the extent federal civil actions are subject to state statute of limitations, state law generally governs the applicability of equitable exceptions. *See Rodriguez Narvaez v. Nazario*, 895 F.2d 38, 42 (1st Cir. 1990). The continuing violation "doctrine has been applied in [Massachusetts] as a limited exception to the six-month statute of limitations for discrimination claims, usually those premised on a hostile work environment." *Silvestris v. Tantasqua Reg'l Sch. Dist.*, 847 N.E.2d 328, 338 (Mass. 2006) (citing *Clifton v. Mass. Bay Transp. Auth.*, 839 N.E.2d 314, 318 (Mass. 2005)). While the applicability of the continuing violation doctrine appears to be limited to discrimination claims in Massachusetts, I nonetheless assume, without deciding for purposes of this Memorandum and Order, that the doctrine may also apply to certain personal injury actions, such as FCA retaliation actions, given the "strong tradition of viewing discrimination as a 'fundamental injury to the individual rights of a person.'" *Morrison v. N. Essex Cmty Coll.*, 780 N.E.2d 132, 135 (Mass. App. Ct. 2002) (quoting *LeGoff v. Trustees of Boston Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass. 1998)).

No. 05-4035, 2006 WL 1064108, at *9 (D. Kan. Apr. 21, 2006)

("finding no support for plaintiff's contention that a

'continuing violation' theory applies to FCA claims"); *United*

*States v. Momence Meadows Nursing Center, Inc.*, No. 04-2289, 2007

WL 685693, at *2 n.2 (C.D. Ill. Mar. 2, 2007) (declining to rule

on the applicability of the continuing violation doctrine to FCA

claims stating that "[t]here is no reason for the court to reach

this issue, undeveloped as it is at this time, because some of

the allegations fall squarely within the limitations period.").

To date, my research has identified only one decision in which a

court has applied the continuing violation doctrine to a

retaliation claim brought under the FCA. *See Pakter v. New York*

*City Dep't. of Educ.*, No. 08-7673, 2010 WL 1141128, at *6

(S.D.N.Y. Mar. 22, 2010) (applying the continuing violation

doctrine simultaneously to § 1983 and FCA claims).

Even assuming, without deciding, that the continuing

violation doctrine applies to FCA retaliation claims, I find that

Dyer cannot reap the benefit of that doctrine. The continuing

violation doctrine requires the plaintiff "to establish that a

[retaliatory] 'anchoring act' occurred within the limitations

period." *Lockridge v. Univ. Of Me. Sys*, 597 F.3d 464, 474 (1st

Cir. 2010) (quoting *Noviello v. City of Boston*, 398 F.3d 76, 86

(1st Cir. 2005)). An anchoring act is one that "substantially

relate[s] to [the] earlier incidents of abuse." *Id.* By

contrast, "discrete [retaliatory] acts," such as termination,

failure to promote, denial of transfer, or refusal to hire "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Gorelik*, 605 F.3d at 122 (quoting *Morgan*, 536 U.S. 113-14).

To justify the application of the continuing violation doctrine, Dyer contends that he was subjected to a "continuous pattern of retaliation" from Defendant starting in 2002 through and beyond his termination in 2007. In particular, Dyer points to three events that allegedly occurred within the limitations period, none of which qualifies as anchoring act for purposes of the continuing violation doctrine.

*First*, Dyer alleges that a former colleague refused to speak to him in October 2007 after he had expressed an interest in an open position in the Company's Corporate Strategic Planning Group.[16] He does not, however, allege that he actually applied for the position. This event is therefore "too speculative to entitle [the Relator] relief." *Id.* at 123. *Second*, Dyer relies on his termination in November 2007 to justify the application of the continuing violation doctrine. Because Dyer's termination occurred over five years after he raised concerns about the Space Imaging reclassification, I find this employment action to be too

---

[16] Dyer also asserts in the Verified Amended Complaint that he contacted several other individuals about open positions within the Company's corporate finance department. (V. Am. Compl. ¶¶ 70, 74.) However, no date is specified as to when these events occurred, making it impossible to establish with certainty whether they are time barred.

remote in time to support a finding of continuing retaliation.
In addition, Dyer recognizes in the Verified Amended Complaint
that he was informed as of October 2007 that "there was not
enough business to support him," thereby suggesting that his
termination was motivated by economic, rather than retaliatory,
concerns.  Consistent with this view, the Verified Amended
Complaint contains no allegation that Defendant filled Dyer's
position after his termination.  *Third*, Dyer alleges that
Defendant took actions to disparage him professionally after his
termination but no details are provided in the Verified Amended
Complaint as to how such actions materialized.  For this reason,
Dyer's allegations regarding any purported attempts by the
Company to disparage him after his termination are again too
speculative to entitle him to relief.  *Id*.

In sum, Dyer has not demonstrated that the alleged
retaliatory acts that occurred within the limitations period
establish the existence of an "anchoring act," *Lockridge*, 597
F.3d at 474, or "a series of wrongful acts [that] blossom[ed]
into an injury on which suit can be brought," *Gorelik*, 605 F.3d
at 122 (quoting *Pérez-Sánchez*, 531 F.3d at 107).  Consequently, I
conclude that the continuing violation doctrine - even if
applicable to FCA retaliation claims - does not justify Dyer's
delay in bringing the present action.  For this reason, I will
dismiss Count III as time barred.

## IV. CONCLUSION

For the reasons set forth more fully above, I DENY the Defendant's motion to dismiss as to Counts I and II, and GRANT that motion as to Count III.  (Dkt. No. 37.)

_**/s/ Douglas P. Woodlock**_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE