UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. ROBERT J. DYER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 08-10341-DPW |
| v. | ) | |
| | ) | |
| RAYTHEON COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM AND ORDER</u>
September 23, 2013

Plaintiff-Relator Robert J. Dyer brings this *qui tam* action alleging that Defendant Raytheon Company violated the False Claims Act, 31 U.S.C. §§ 3729, by inducing the government to reimburse it for artificially inflated bonuses to Raytheon executives.  Dyer alleges that the Federal Acquisition Regulations ("FAR") allow a government contractor to seek reimbursement from the government for incentive compensation only so long as it is paid according to an established plan, but that Raytheon knowingly submitted expenses for payments that did not abide by the rules of the plan.

The parties filed cross-motions for summary judgment, and each has filed ancillary motions seeking to compel, strike, or exclude certain evidence offered by the other.  I will grant Raytheon's motion for summary judgment because I find that Dyer has not identified a genuine issue of fact to support the

essential proposition that Raytheon acted with the requisite knowledge of falsity.

## I.  BACKGROUND

In 2000, Raytheon developed a new incentive compensation program called the Raytheon Working Capital Incentive Program ("RWIP").  (Dkt. 85 ¶ 17; Dkt. 81 ¶¶ 6-7.)  Raytheon had become concerned about its working capital turnover and high debt, and sought a way to stabilize the company financially.  The purpose of the RWIP was to "improve operating efficiency and reduce Raytheon's investment in working capital with a goal of freeing up capital that Raytheon could use to pay down debt . . . and support the growth and development of the business."

The RWIP encouraged executives to find new ways to improve Raytheon's working capital position by paying the executives a percentage of the savings they generated.  The RWIP was also designed to be "self-funding" by paying the participants a percentage of the interest savings they earned. The brochure designed to teach program participants about the RWIP explained;,

> We are targeting to remove approximately $470 Million in working capital and save approximately $33 Million in interest.  This is where your payout comes from:  as we improve our efficiency, a portion of the interest saving will be used to reward the participants who have achieved this goal.

The RWIP was limited to six business units within Raytheon including the Command Control Communications and Information

2

Systems ("C3I") unit, and included about 2,000 executives as participants.

## A.    *Development of the RWIP*

Raytheon hired Dyer in February 2000 as Manager of Financial Analysis in the Corporate Finance Group at the suggestion of Raytheon's Chief Financial Officer, Franklyn Caine, who had worked with Dyer previously at United Technologies where Dyer was part of a group that put together a working capital program. Dyer's direct supervisor at Raytheon was Gary McCauley, the Vice President for Financial Analysis.  Dyer developed and drafted many of the documents and presentations outlining the RWIP, but McCauley retained final approval and final editing authority.

In March 2001, The Vice President and Deputy Director of Human Resources for Raytheon, Keith Peden, presented the RWIP to the Management Development and Compensation Committee ("MDCC") of Raytheon's Board of Directors.  Dyer and Sarah Sumner, a Human Resources Employee, put together the PowerPoint presentation for the meeting, but Dyer himself did not attend the meeting.  The MDCC approved the concept and Raytheon rolled the RWIP out in June 2001.

Dyer drafted and prepared various informational materials to explain the program to the participants.  Many of these documents specified that "[o]nly operational and process improvements count toward target achievement."  For instance, the RWIP brochure

(designed to teach plan participants about the elements and guidelines for the program), the Working Capital Strategy PowerPoint presentation (used to train business unit leaders in the purposes and administration of the program), and the Leadership Team Presentation (developed to brief the CFOs, controllers, and departments heads on the RWIP) all included this phrase.  Notably, the Leadership Team Presentation also stated that "[t]he impact of reclassification and other non-operational accounting entries will be neutralized."  However, this is the only presentation in which the language appeared because McCauley edited it out of later presentations.  Dyer also prepared the 2001 Working Capital Initiative briefing for the C3I business unit, which included a list of examples of operational and process improvements that would count toward target goals.

In August 2001, Raytheon presented the RWIP to Herb Homer, Raytheon's government contact and the officer at the Defense Contract Management Agency ("DCMA") in charge of Raytheon, in the context of an "informational" meeting.  Although Dyer would not normally have attended such a meeting, he requested and was given permission to attend this one along with McCauley and Terence Murphy, Raytheon's Assistant Controller for Government Accounting.  In preparation for the meeting, Dyer drafted, and McCauley and Murphy reviewed, a PowerPoint presentation describing the RWIP.  The presentation included a list of the

kinds of improvements that might count toward target goals - the same list that appeared in the C3I presentation.  Dyer testified in his deposition that, at the meeting, he responded to specific questions from Homer and represented to him that only real improvements resulting in working capital savings and cash production would count toward target achievement goals and that accounting reclassifications would not fall within the parameters of the plan.  Neither McCauley nor Murphy has an independent recollection of what was said at the meeting.  At the end of the meeting, Homer endorsed the idea of the RWIP, but there was no formal agreement.

## B. The Space Imaging Accounting Reclassification

In November 2001, Dyer learned that C3I had included a $23.7 million accounting reclassification toward its target goals under the RWIP.  Near the end of 2000, a customer of Raytheon's C3I business unit called Space Imaging faced a liquidity crisis and was almost $80 million in arrears, including a $23.7 million receivable due to Raytheon.  Raytheon elected to defer Space Imaging's payment by reclassifying the short-term receivable as a long-term asset in order to avoid providing a cash infusion that would otherwise be necessary for Space Imaging to pay down the receivable, an undesirable option for a variety of reasons.  In his deposition testimony, James Singer, Raytheon's Manager of Balance Sheet and Cash Flow, testified that an account

reclassification is "like transferring your checking account balance to your savings account balance."

When Dyer discovered that C3I had counted the Space Imaging accounting reclassification toward its RWIP targets, he sent an email to the CFOs for each of the relevant business units on his own initiative, asking them to identify and exclude all accounting reclassifications.  Specifically, the email stated:

> You will remember back to the inception of the [RWIP] a set of ground rules that stated only process improvements would count toward goal achievement.  As a housekeeping item related to calculating the actual 2001 working capital turnover performance will be to identify and exclude any reclassifications made between working capital accounts and other balance sheet accounts during 2001.

McCauley testified in his deposition that nothing in this email was inconsistent or contrary to his understanding of the RWIP. Officers for the C3I business unit responded to Dyer's email by identifying two smaller accounting reclassifications that they had excluded from progress toward RWIP goals, but continuing to count the $23.7 million from the Space Imaging reclassification.

Dyer raised the issue with McCauley, who, in turn, sought clarification from Farnsworth, the CFO for C3I.  Farnsworth emailed McCauley providing a detailed justification for counting the Space Imaging reclassification toward RWIP targets and referring to Dyer as an "idiot" for raising concern over the mechanism of the transaction rather than its substance.  In essence Farnsworth believed the reclassification should count

toward the RWIP because it was merely a mechanism to provide Space Imaging a longer term loan to pay off its short term debt, but without the need to expend the actual cash, resulting in savings for Raytheon.  McCauley forwarded a substantively identical, but more formal, explanation to Dyer on January 16, 2002.

Because McCauley and Farnsworth did not agree with him, Dyer elevated the issue to Edward Pliner, Raytheon's Corporate Controller.  Pliner agreed with McCauley and Farnsworth and responded to Dyer that he did not think there was "any attempt to hide the ball."  Finally, Dyer suggested to McCauley that he wanted to elevate the issue to Raytheon's CFO, Franklyn Caine.  Dyer testified in his deposition that McCauley responded by saying "We're not going to talk about this any more.  The issue is over.  We're not going to do this anymore."  Nevertheless, Dyer made one last attempt to raise the issue when he prepared the Final 2001 Performance Appraisal for the C3I Business Unit.  In that final appraisal, Dyer included language stating "[t]he results have not been adjusted to negate for a $23.7 million reclass of short term receivable to the long-term asset account."  McCauley removed this language from the final draft.

C3I executives participating in the RWIP received a total of $3.4 million in RWIP incentive bonuses for the Plan Year 2001.

## C.    *Billing the Government*

Raytheon frequently contracts with the government.  Under
the Federal Acquisition Requirement ("FAR"), Raytheon can seek
reimbursement from the government for indirect costs, such as
incentive compensation.  The government reimburses these indirect
costs by spreading the costs across many different contracts it
has with Raytheon.  Raytheon submitted at least a portion of the
$3.4 million in RWIP incentive bonus payments for C3I executives
to the government for reimbursement.

## II.   EVIDENTIARY MOTIONS

Both parties have filed motions seeking to compel, strike,
or exclude portions of the opposing party's evidence.  Plaintiff
filed three such motions.  Defendant filed one.

Dyer first asks me to find certain of the Raytheon's
responses to his request for admissions insufficient under Fed.
R. Civ. P. 36, and therefore to deem the requests admitted.
Next, he moves to compel the disclosure and production of certain
documents and information relating to Raytheon's expert.
Finally, he moves to strike two paragraphs of a declaration by
McCauley Declaration as contradictory to McCauley's prior
deposition testimony.

For its part, Raytheon moves to exclude or limit the
testimony of Dyer's expert, Howard Silverstone, as unsupported,
improper, and because he is unqualified. After the hearing, in

accordance with the scheduling order, Plaintiff filed its

opposition to one of the evidentiary motions and also filed a new

*Daubert* motion to exclude certain testimony by Defendant's

expert, Mr. Kiraly.

Because these motions affect the evidence I may consider in

deciding the cross-motions for summary judgment, I address each

evidentiary motion in turn before considering summary judgment.

**A.    *Request for Admissions***

Dyer argues, citing no case law and no authority other than

Fed. R. Civ. P. 36 itself, that Raytheon's responses to two

requests for admission are legally insufficient and that I should

therefore deem the two requests admitted.  Raytheon both objects

to the requests as improper and claims that its responses are

sufficient.  I sustain Raytheon's objection, and find its

responses sufficient.

Dyer's First Request for Admissions asks Raytheon to admit

that it did not present any documents to the government

indicating that the RWIP would include either accounting

reclassifications or management discretion.  Specifically, the

requests read:

> REQUEST FOR ADMISSION NO. 17
>
> There are no documents prepared by Raytheon and
> presented to the Government regarding the Raytheon
> Working Capital Incentive Program which state and/or
> indicate that "Accounting Reclassifications" would be
> allowed to be counted toward target achievement goals
> relative to the payment of incentive compensation

bonuses as part of the Raytheon Working Capital
Incentive Program.

REQUEST FOR ADMISSION NO. 19

There are no documents prepared by Raytheon and
presented to the Government regarding the Raytheon
Working Capital Incentive Program which state and/or
indicate that Raytheon business units and Raytheon
senior management had the right to exercise their
discretion to determine which items would be allowed to
be counted toward target achievement goals relative to
the payment of incentive compensation bonuses as part
of the Raytheon Working Capital Incentive Program.

Raytheon objects, claiming the requests improperly ask it to

characterize documents when the documents themselves are the best

evidence of their contents.  Raytheon further responds stating

that the only document "prepared by Raytheon and presented to the

Government" was the August 2001 informational briefing document

presented to Herbert Homer and that this document "does not state

one way or the other" whether the RWIP includes accounting

reclassifications or management discretion.

Defendant's qualified admission, identifying the only

document it believes was presented to the government and

clarifying that the document does not address either issue "one

way or the other" fairly addresses the substance of the request

and fairly qualifies the admission to address certain assumptions

implicit in the language of the request.  *See First Options of

Chicago, Inc.* v. *Wallenstein*, No. Civ. A. 92-5770, 1996 WL

729816, *3 (E.D.Pa. Dec. 17, 1996) ("If the defendant objects to

certain assumptions of facts made in the request, the defendant

may qualify his answer based on his understanding of the facts."); *Tri-State Hosp. Supply Corp.* v. *United States*, 226 F.R.D. 118, 138 (D.D.C. 2005) ("[A party] should be able to explain its position and not be bullied into an admission it does not want to make.").

Raytheon's response is not evasive. It is qualified to address what Defendant sees as a potentially problematic ambiguity. Fed. R. Civ. P. 36(a)(4) provides that "when good faith requires that a party qualify an answer . . . the answer must specify the part admitted and qualify or deny the rest." This is precisely what Defendant has done. *Cf. Harris* v. *Oil Reclaiming Co., Ltd.*, 190 F.R.D. 674, 676-77 (D. Kan. 1999) (finding that where a Plaintiff requested that Defendant admit that he signed certain checks, Defendant appropriately qualified his response stating that he signed in his official capacity where the language of the request "implie[d] the checks were signed . . . in his individual capacity"). This kind of qualification is especially appropriate here because Plaintiff's requests go to the heart of the issue in this case: whether accounting reclassifcations would necessarily fall outside the RWIP. *Wiwa* v. *Royal Dutch Petroleum Co.,* Nos. 96 Civ. 8386, 01 Civ. 1909, 2009 WL 1457142, *4 (S.D.N.Y. 2009) ("Qualifying a response may be particularly appropriate if the request . . .

involves sharply contested issues, or goes to the heart of a defendant's liability.").

I will also sustain Defendant's objection to these requests. The requests do nothing to narrow the issues in the case or clarify facts that are not in dispute, the purposes of Fed. R. Civ. P. 36. *See* Advisory Committee Notes to the 1970 Amendments to the Fed. R. Civ. P. ("Rule 36 serves two vital purposes[:] . . . to facilitate proof with respect to issues that cannot be eliminated from the case, and . . . to narrow the issues by eliminating those that can be.").  Both requests merely ask Raytheon to declare the content of certain documents.  Yet the documents themselves are the appropriate evidence of their contents. *Lakehead Pipe Line Co.* v. *American Home Assur. Co.,* 177 F.R.D. 454, 457 (D. Minn. 1997) (sustaining an objection to a rule for admission that seeks "a synoptic characterization of the documents, or a gloss as to their intendment" because the responding party admitted to the authenticity of the document but refused to summarize the contents of the document); *see also Zen Investments, LLC* v. *Unbreakable Co.,* No. 06-cv-4424, 2008 WL 4489803, *2 (E.D.Pa. Oct. 7, 2008).

To be sure, under Rule 36, a party may properly seek an admission regarding the *interpretation* of a document. *See Sigmund* v. *Starwood Urban Retail VI, LLC*, 236 F.R.D. 43, 46 (D.D.C. 2006) ("[A] request for admission that relates to the

interpretation of a contract at issue . . . would be permissible under the amended Rule 36."); *see also The Hanover Ins. Group* v. *Rosciti*, No. 06-cv-276T, 2008 WL 1767089, *2 (D.R.I. Apr. 15, 2008). However, Dyer's request does not ask for Defendant's interpretation of any language in documents provided to the government. It simply asks Defendant to admit that no document it provided to the government makes the statements in question.

Even if these requests did call for interpretation, they would still be improper. To the extent Request No. 17 calls for interpretation, it impermissibly asks Defendant to admit that accounting reclassifications do not fall within the meaning of "working capital improvement," which is an intensely disputed issue. *Lakehead Pipe Line,* 177 F.R.D. at 458 ("[R]equests for admission are not to be employed as a means 'to establish facts which are obviously in dispute . . . .") (quoting *Kosta* v. *Connolly*, 709 F. Supp. 592, 594 (E.D.Pa. 1989)). Similarly, the implication underlying Request No. 19 is that if the plan did not expressly provide for managerial discretion, then none would have been permissible. Therefore, to the extent it calls for interpretation, it asks Defendant to make an admission regarding the understood default position for managerial discretion, another intensely disputed issue which is not properly the subject of a request for admission.

**B.   Motion to Compel**

Dyer next argues, again citing no case law and no authority
other than Fed. R. Civ. P. 26(a)(2)(B) itself, that the report of
Stephen Kiraly, Raytheon's expert, does not provide the required
facts, data, exhibits, or basis for five separate conclusions he
draws.  With a single exception, Dyer does not provide any
substantive explanation for why he believes Mr. Kiraly's
conclusions are unsupported.  He simply levels conclusory
allegations at various of Mr. Kiraly's opinions.  I find that
Kiraly's report satisfies the requirements of Fed. R. Civ. P.
26(a)(2)(B) because he cites the documents and other sources he
relied upon in reaching each conclusion in his report.

Dyer does not allege that Kiraly relied on documents that he
did not disclose, nor can he allege in good faith that Kiraly did
not list any documents or sources for the conclusions in
question.

I share the view that "[t]he primary purpose of Rule
26(a)(2) is to require disclosure of expert testimony
sufficiently in advance of trial so that opposing parties have a
reasonable opportunity to prepare for effective cross examination
and perhaps arrange for expert testimony from other witnesses."
*Flebotte v. Dow Jones & Co., Inc.*, No. Civ. A 97-30117, 2000 WL
35539238, *7 (D. Mass. Dec. 6, 2000).  Courts will exclude
testimony for failure to provide *any* underlying documents or

sources on which the expert relied.  *See, e.g.*, *Pena Crespo* v. *Puerto Rico*, 408 F.3d 10, 13-14 (1st Cir. 2005) (affirming a district courts decision to exclude expert testimony where the report "did not . . . explain the basis and reasons for Dr. Alonso's opinions [or] describe any exhibits Dr. Alonso planned on using").  However, a report need not contain an exhaustive account of all information considered and calculations performed over the course of the expert's research in order to satisfy Rule 26(b)(2)(B), but must provide the reasoning and information supporting the conclusions articulated in the report.  *Cf*. *Flebotte*, 2000 WL 35539238 at *7 ("[N]either the plain language of the rule nor its purpose compels disclosure of every calculation or test conducted by the expert during formation of the report.  Indeed, the defendant's expert disclosure provided the plaintiffs with a fair opportunity to adequately prepare a rebuttal to the defendant's expert testimony." (internal citations omitted)).  Kiraly's report provides thorough reasoning for his conclusions and substantial documentation.  This is certainly sufficient to allow Dyer and his expert to prepare for cross-examination.

If Dyer believes that the sources and documentation Kiraly relied upon do not appropriately support the conclusions Kiraly draws, his recourse is to a *Daubert* motion or inquiry on cross-examination into whether the evidence Kiraly relied upon is

sufficient to support his conclusions.  But Dyer's belief that the documents and sources Kiraly provides are insufficient is not proper grounds for exclusion under Rule 26(b)(2)(B).  After the motion hearing, Dyer filed a separeate motion to exclude Mr. Kiraly's report and testimony on *Daubert* grounds.  I address that motion below.  *See* Section II.(C).

For the sake of completeness, however, I will briefly address each of Dyer's specific objections.

*First*, Dyer objects to the conclusion that "DCAA ultimately determined the RWIP costs were allowable" because, he claims, the August 2, 2004 DCAA audit report cited by Kiraly references incentive compensation related to a separate and distinct incentive compensation plan only, not compensation under the RWIP.  This objection does not take issue with whether Kiraly provided support, but rather the sufficiency and accuracy of the support.  That is properly the subject of cross-examination at trial or perhaps a *Daubert* motion but not a motion to compel or exclude under Rule 26(b)(2)(B).  Moreover, it appears that the August 2, 2004 DCAA audit report does discuss the RWIP because it refers to the "working capital bonus," which indicates the bonus plan linked to diminishing costs to increase working capital - the RWIP.

*Second*, Dyer objects that the report "fails to provide any facts, data, exhibits or basis . . . to provide support and evidence that the audit included a specific examination of the allowability of the $23.7 Million Accounting Reclassification taken by the C31 Business Unit for RWIP purposes."  However, the report does not claim that the DCAA's audit specifically examined the allowability of the reclassification of the $23.7 million receivable from Space Imaging.  It only concludes that the DCAA determined that the RWIP costs as a whole were allowable.  No support is necessary either logically or under Rule 26(b)(2)(B) for a claim that an expert does not make.  Therefore, this objection is unfounded.

*Third*, Dyer objects that Kiraly "fails to provide any facts, data, exhibits or basis in his Report to support his opinion regarding how much of the excess compensation [compensation above a regulatory limit that the government is not obligated to pay] was attributable to the RWIP Plan and how much was attributable to other salary and bonus plans."  This is simply false.  Kiraly cites numerous sources including the OMB report setting out the regulatory cap, various DCAA audit reports, various exhibits to the complaint and depositions in this case, and other documents.

*Fourth*, Dyer objects that "Mr. Kiraly fails to provide any facts, source data, exhibits or basis in his Report to support" his "proposed damage estimate applying a 42% cost reimbursable

17

percentage [because] not all Raytheon costs [were] recovered from the Government." Kiraly does not set out the documents underlying this opinion in footnotes the way he identifies the documents for the opinions discussed above. But Kiraly attaches to his report Schedules 9-11 which identify the data, sources, and calculations he relied on in arriving at his conclusions. Plaintiff himself even cites to one of these documents in his motion, demonstrating that this objection, too, goes to the sufficiency of the evidence and not whether Kiraly provided the documents he reviewed and relied upon. It therefore fails for the same reason as the previous objections.

*Fifth,* Dyer objects that Kiraly "fails to provide in his Report, the facts, data, exhibits or basis detailing how the $3,430,000 of the costs of the RWIP Plan was specifically allocated across the various contracts held by Raytheon." In the same way Kiraly sets out the data, sources, and calculations he relied on in arriving at his conclusions underlying the opinion discussed in Dyer's fourth objection, he also identifies the data, sources, and calculations he relied on in arriving at his conclusions underlying this opinion in the Schedules attached to the report, in this case, Schedules 1-2 and 9-11. Raytheon specifically points to Schedules 10 and 10A which "detail the allocation of direct labor costs across various categories of

18

contracts in C3I's Intelligence & Information Systems unit . . .
."

I therefore deny Plaintiff's motion to compel or strike any
aspect of Kiraly's report for failure to satisfy the requirements
on Rule 26(b)(2)(B).

## C.   *Motion to Exclude Kiraly Testimony and Report*

Dyer also brings *Daubert* and relevance challenges to four
specific paragraphs of Mr. Kiraly's report, arguing that they are
not "sufficiently tied to the facts of the case." *Daubert*, 509
U.S. at 591.  He argues that Mr. Kiraly bases his opinions on
premises – that other incentive plans existed, that RWIP did not
preclude accounting reclassifications and that Raytheon managers
had discretion to alter the terms of the plan – which Dyer
contends are false.

However, these facts are the crux of the factual dispute
underlying this case.  *See infra* Section IV(B).   In the guise of
an argument that Mr. Kiraly's opinion must have a reliable
factual foundation, Dyer essentially challenges the report on the
basis that Mr. Kiraly does not interpret the facts the way Dyer
himself does.  Dyer's disagreement with the facts as Mr. Kiraly
sees them is not grounds for exclusion.  *Int'l Adhesive Coating
Co.* v. *Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir.
1988) (rejecting "arguments against admissibility [that were]
simply a rehashing of the central factual disputes of the case

dressed up as attacks on the expert's testimony through Rule 703").

The case law Dyer cites stands for the proposition that an expert may not base an opinion on studies that are not analogous to the facts of the case and must reliably apply the chosen methodology by not ignoring relevant evidence. *See General Electric Co.* v. *Joiner,* 522 U.S. 136, 146-47 (1997)(upholding the exclusion of expert testimony because the expert based his opinion on studies that were not analogous to the facts of the case); *Bogosian* v. *Mercedes-Benz of N. Am.*, 104 F.3d 472, 479 (1st Cir. 1997) (excluding expert testimony which was based on a hypothetical situation for which there was no evidence it was applicable to the case); *In re Xcelera.com Secs. Litig.*, 2008 WL 7084626, *1 (D. Mass. Apr. 25, 2008) (precluding testimony by proposed expert Scott Hakala because his theory regarding the effect of a corrective disclosure on a company's stock failed to take into account market trading on the day following the disclosure and therefore "his theory d[id] not match the facts").  These cases do not stand for the proposition that disputed facts are an impermissible basis for expert testimony. *Cf. U.S.* v. *Shay*, 57 F.3d 126, 133 n.5 (1st Cir. 1995)("The concept of 'fit' requires that a valid connection exist between the expert's testimony and a disputed issue.").

Nor are any of Mr. Kiraly's opinions based on clearly untenable interpretations of the facts.

The purpose of an expert is to assist the jury in resolving disputes of fact.  It would be an unacceptable drain on, and a misuse of, judicial resources to allow a *Daubert* motion to become a mini-trial on the very facts the expert is intended to help the jury later resolve.  Instead, disputes over the facts on which an expert bases his opinions go to the weight of the testimony, not its admissibility.  *Crowe* v. *Marchand*, 506 F.3d 13, 18 (1st Cir. 2007).  Dyer may explore the sufficiency of the foundations for Mr. Kiraly's opinions on cross-examination, but there is an adequate foundation shown on this record to consider his testimony in connection with summary judgment motions.

Dyer also challenges these same four paragraphs on Rule 403 grounds, arguing that the probative value of these statements is substantially outweighed by a danger of unfair prejudice or confusion of the issues.  He asserts no new arguments on these grounds, but relies instead on his arguments in support of the *Daubert* challenges.  These Rule 403 arguments are derivative of his *Daubert* challenges and fail for the same reasons.

For the sake of completeness, I separately address each of Dyer's specific objections.

### 1. Paragraph 39 – RWIP Costs Not Unusual

Dyer objects to the premise of the sentence in Paragraph 39 of Mr. Kiraly's report which states that "[g]iven that bonus and incentive compensation programs existed at Raytheon prior to the creation of the RWIP program, these costs would not be considered special or unusual."  Dyer contends RWIP was a new program designed to be administered separately from previously existing bonus and incentive compensation plans.  However, Dyer's own objection confirms Mr. Kiraly's premise.  If, as Dyer agrees, Raytheon had previously existing bonus and incentive compensation plans, then there can be no problem with a statement that assumes the existence of such previous plans.  The fact that RWIP was a "new" plan and that it was to be administered separately does not somehow render previously existing plans nonexistent or irrelevant.

### 2. Paragraph 41 – Homer Meeting Impact on Allowability

Dyer objects to the sentence in Paragraph 41 of Mr. Kiraly's report stating, "[a]s the informational briefing with Mr. Homer did not result in the determination as to how RWIP bonus payments should be treated under the FAR, it had no impact on whether the RWIP bonus payments would ultimately be allowable or unallowable," because only Dyer has an independent recollection of what occurred during the meeting with Homer, and he testified that he informed Homer accounting reclassifications would not be

counted.  As discussed more fully below, *see infra* Section II(D),
Dyer misunderstands the absence of evidence regarding what
occurred *during* the meeting by treating that circumstance as an
absence of evidence regarding the *results* of the meeting.  In
fact, consistent with Mr. Kiraly's statement, McCauley has
provided a declaration stating that the meeting with Homer did
not result in any formal agreement.

### 3. Paragraph 45 - "Established Plan" and Discretion

Dyer objects to Paragraph 45 on two grounds.  First, he
argues that there is no factual basis for Mr. Kiraly's statement,
"Raytheon's RWIP program had been communicated to employees and
established expectations that a bonus could be earned. . . . [A]
plan may still be considered 'established' even if its terms are
adjusted or modified over time pursuant to the contractor's
discretion."  Again, Dyer bases his objection on the fact that
RWIP was a new plan.  However, nothing about the newness of the
plan is inconsistent with it being established based on
communications to employees and established expectations.  The
plan need not be longstanding to constitute an "established"
plan.  If it were otherwise, no company could ever create a new
plan eligible for reimbursement under FAR.

Second, Dyer argues that there is no evidence that Raytheon
management had discretion to modify or adjust the terms of the
plan.  Dyer's assertion cannot withstand any level of review of

23

the record.  As discussed more fully below, *see infra* Section
IV(B)(2), the question of discretion is an intensely disputed
factual issue, and, in fact, a number of Raytheon witnesses have
testified that they believed they did have such discretion.  I
will not exclude Mr. Kiraly's testimony on the basis that it
conflicts with Dyer's view of these disputed facts.  *See Int'l
Adhesive Coating Co.*, 851 F.2d at 545.

### 4. Paragraph 61 - Discretion Is Not a Major Revision

Dyer objects to two sentences in Paragraph 61 of Mr.
Kiraly's report.  First, he objects to the sentence stating,
"*Raytheon has had incentive compensation programs for many years
of which RWIP was only a part* of the total incentive compensation
in 2001," because RWIP was a new program designed to be
administered separately from previously existing bonus and
incentive compensation plans.  However, as with his objection to
Paragraph 39, *see supra* Section II(C)(1), Dyer's own objection
confirms Mr. Kiraly's premise.  The fact that RWIP was a "new"
plan created to operate, in addition to preexisting older plans,
confirms that RWIP was only a part of the incentive compensation
structure in 2001.

Second, Dyer objects to the sentence stating "[i]n my
opinion this exercise of management discretion to include the
reclassification does not constitute a major revision to the
plan," contending that this is a legal issue and therefore an

inappropriate subject for expert opinion.  *See Nieves-Villanueva*
v. *Soto-Rivera*, 133 F.3d 92, 99-100 (1st Cir. 1997) ("In our
legal system, purely legal questions and instructions to the jury
on the law to be applied to the resolution of the dispute before
them is exclusively the domain of the judge.").  Raytheon itself
agrees that this is a legal issue not suitable for expert
testimony.  In its response to Plaintiff's 56.1 statement
asserting that certain actions constituted a major revision,
Raytheon stated, "[w]hether or not a particular transaction
constitutes a major revision . . . is a question of law . . . ."
Both parties are correct.  Mr. Kiraly's statement appears in the
rebuttal portion of his report, responding to Plaintiff's expert,
Mr. Silverstone, on the same subject.  What constitutes a major
revision is not the proper domain of a trial expert.  I will
exclude this portion of Mr. Kiraly's report and testimony as I
will also exclude the analogous testimony on this subject from
Plaintiff's expert Mr. Silverstone.  *See infra* Section II(E)(2).

**D.   *Motion to Strike***

Dyer's final evidentiary motion seeks to strike two
paragraphs from the Declaration of Gary McCauley, which Defendant
submitted in support of its motion for summary judgment.
Plaintiff argues that paragraphs 7 and 8 of McCauley's
declaration are improper because they directly conflict with his
prior deposition testimony.  *See Morales* v. *A.C. Orssleff's EFTF*,

246 F.3d 32, 35 (1st Cir. 2001).  In *Morales*, the First Circuit held that "[w]hen opposing a summary judgment motion, a party may not create an issue of fact simply by submitting an affidavit that, without explanation, directly contradicts his or her prior deposition testimony or answers to interrogatories." *Id.*  I find that McCauley's declaration does not directly contradict his prior testimony.  Incidentally, it is also unlikely and, without more, implausible that Raytheon would attempt to use McCauley's declaration to *create* an issue of fact considering that it has moved for summary judgment, necessarily arguing that all the relevant underlying facts are undisputed.

In his declaration, McCauley states:

7. In August 2001, I presented an informational briefing to Herb Homer, the Defense Contract Executive ("DCE") assigned to Raytheon. This meeting was intended only to provide Mr. Homer with a broad overview of RWIP.

8. The meeting with Mr. Homer resulted in no formal or written agreement with the United States government related to RWIP.

These statements are entirely consistent with his prior testimony, stating "I recall we had a meeting, yes, with Herb," and "[w]e did an information briefing to Herb Homer, yes."

Dyer's contention that statements in the Declaration directly conflict with McCauley's prior testimony that he had no independent recollection of the *details* of the

meeting, misapprehends the content of the declaration.   The
McCauley Declaration speaks only to his *prospective*
understanding of the purpose of the meeting and his
*retrospective* understanding of the results of the meeting.
He does not swear to any independent recollection of what
happened *during* the meeting itself.   McCauley only swears to
the fact that the meeting took place, which is consistent
with his recollections in his deposition testimony, and to
the general purpose of the meeting: "I presented an
information briefing to Herb Homer . . . . This meeting was
*intended* only to provide Mr. Homer with a broad overview of
RWIP."   Thus, nothing in the declaration directly conflicts
with his deposition testimony, where he stated "I don't
recall the specifics of the meeting," and in response to the
question 'Do you, as you sit here today, have an independent
recollection of what happened that day?' answered No."

    In Paragraph 8, the McCauley declaration states that
the meeting did not result in any formal or written
agreement.   This, too, is consistent with McCauley's
deposition testimony.   McCauley's inability to recall the
specifics of the meeting itself does not directly conflict
with his sworn statement regarding the outcome of that
meeting.

I will therefore deny Plaintiff's motion to strike
Paragraphs 7 and 8 of the McCauley Declaration.

**E.   *Motion to Exclude Silverstone Testimony and Report***

Raytheon moves to exclude or limit the testimony and expert
report of Plaintiff's expert, Howard Silverstone, as unsupported
and improper.  It articulates three distinct objections: (1) the
report opines on subjects inappropriate for expert testimony, (2)
Silverstone is not a qualified expert in the relevant field, and
(3) the conclusions Silverstone provides are unsupported.  As
discussed below, I find that many, but not all of the subjects
Silverstone addresses in his expert report are improper.  I find
that Silverstone is qualified to discuss accounting terms, but
not to interpret government contracting regulations.  Finally, I
find that Silverstone has not provided essential support for any
subject he properly discusses in his report.  I will therefore
exclude his expert report.

### 1.   Proper Subjects for Experts

Raytheon objects to Silverstone's expert report arguing that
it contains opinions and conclusions on a variety of subjects
outside the purview of litigation experts.  I agree.  However,
the expert report discusses appropriate subjects as well.

#### a.   *Facts of the Case*

In his expert report, Silverstone recounts his own summary
of the facts underlying this case.  Specifically, he details his

28

account of the motivation behind the RWIP, the creation of the RWIP, and the presentation of the RWIP to both Raytheon management and Herb Homer.  This impermissibly impinges on the core function of the jury as finders of fact.  As the First Circuit has held in the criminal context, a party may not use an expert to "bolster the credibility of [its] fact witnesses by mirroring their version of events." *United States* v. *Montas*, 41 F.3d 775, 784 n.4 (1st Cir. 1994.); *see also Hecht* v. *Waterville Dev. Corp.*, No. 05-cv-462, 2007 WL 542151, at *2 (D.N.H. Feb. 16, 2007) (finding expert testimony improper where the expert has merely placed an "expert sheen on matters well within the jury's own ordinary experience and common sense").  Silverstone brings no "scientific, technical or other specialized knowledge" to the facts underlying this case, as required by Fed. R. Evid. 702.

Moreover, no technical or specialized knowledge is necessary to understand the facts of the case, and therefore, no expert is necessary.  "Expert testimony does not assist where the [trier of fact] has no need for an opinion because it easily can be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic." *United States* v. *Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6264 (2005)).  Dyer argues, citing no authority, that Silverstone recounts these facts only as the basis for his opinions.  But this purported

factual recitation adds nothing to his opinion.  I will therefore exclude the aspects of Silverstone's report that merely recount the facts of the case without providing any form of expert analysis.

   b.  *Legal Conclusions*

   Silverstone also provides certain legal conclusions in his expert report.  For instance, he provides conclusions as to the ultimate issue in the case:  that Defendant "has knowingly misrepresented the results of the RWIP, [and] presented false claims and bills to the Government . . . ."  Opinions regarding the state of the law, interpretation of statutes or regulations, or the ultimate application of the facts to the law fall far outside the purview of expert testimony.

   It is well established that the law is the exclusive domain of the judge and is not a proper subject for expert testimony. *See Nieves-Villanueva* v. *Soto-Rivera*, 133 F.3d 92, 99-100 (1st Cir. 1997) ("In our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge.").  Dyer may not use an expert report to usurp the role of judge in this case.  I will therefore exclude any conclusions or statements in the expert report purporting to describe or interpret the law rather than accounting facts and terminology.

c.   *Raytheon's State of Mind*

Raytheon next objects to those parts of the expert report in which Silverstone makes claims about the Defendant's state of mind.  In the same breath in which Silverstone purports to decide the ultimate issue in this case, he concludes "to a reasonable degree of accounting and economic certainty" that "Raytheon knowingly misrepresented the results of the RWIP."  However, it is well settled that an expert cannot bring any scientific, technical, or specialized knowledge to bear on another person's knowledge.  Silverstone may not testify or opine on the issue of Raytheon's knowledge or intent.  *See, e.g., Holmes Grp., Inc.* v. *RPS Prods., Inc.*, No. 03-40146, 2010 WL 7867756, *5 (D. Mass. June 25, 2010) ("An expert may not testify to another person's intent.  No level of experience or expertise will make an expert witness a mind-reader.").

Dyer agrees that an expert may not testify to a parties' state of mind but argues - again without authority - that Silverstone may "reference facts relating to Raytheon's submission of the challenged bonuses" as long as he does not provide "an interpretation." Such testimony would invade the province of the jury as fact finders who are capable of evaluation knowledge without the benefit of expert testimony. Furthermore, Silverstone's report goes well beyond mere "references," purporting to opine on the ultimate conclusion that

"Raytheon *knowingly* misrepresented the results of the RWIP."
This is inappropriate for expert testimony.  I will therefore
exclude any conclusions or statements in the expert report
regarding the state of Defendant's knowledge or intent.

    *d. Operational and Process Improvements*

    Raytheon also objects to the otherwise *permissible* testimony
that Silverstone offers.  Defendant argues that because the full
phrase "operational and process improvements" is not a term of
art within Silverstone's area of expertise, he should not be
permitted to assist the jury in understanding its meaning.
Raytheon argues that "absent any need to clarify or define terms
of art, science, or trade, expert opinion testimony to interpret
contract language is inadmissible." *N. Am. Specialty Ins. Co.* v.
*Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997).  While the full
phrase "operational and process improvements" may not be a term
of art, the individual words are technical terms outside the
normal realm of a juror's common sense and understanding.

    The average juror does not have the background in accounting
terminology to sufficiently understand immediately or intuitively
the concepts of "operational improvements" or "process
improvements."  Expert testimony on the meaning of these terms
would therefore assist the trier of fact to determine the issue
intelligently and rationally.  *United States* v. *Shay*, 57 F.3d
126, 132 (1st Cir. 1995) ("The fundamental question that a court

must answer in determining whether a proposed expert's testimony
will assist the trier of fact is whether the untrained layman
would be qualified to determine intelligently and to the best
degree, the particular issue without enlightenment from those
having a specialized understanding of the subject matter
involved." (internal alterations and quotation marks omitted)).
I therefore find that the meaning of the terms in the phrase
"operational and process improvements" is an appropriate subject
for expert testimony.

   2.   Silverstone's Qualifications

   Raytheon argues that even if the meaning of "operational and
process improvements" is a proper subject for expert testimony,
that Silverstone is not qualified to provide that testimony.
However, Defendant again puts undue emphasis on the full phrase
"operational and process improvements" and ignores the
possibility that, as an expert in the area of accounting,
Silverstone can provide useful specialized knowledge regarding
accounting reclassifications and whether or not they can properly
constitute an operational improvement or a process improvement.

   Silverstone is a forensic accountant with expertise in
investigative accounting.  Raytheon contends that this does not
qualify him as an expert in "all things business," citing *Whiting*
v. *Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) ("Just
as a lawyer is not by general education and experience qualified

to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease."). However, Dyer does not hold Silverstone out as an expert on "all things business." Rather, he seeks to introduce Silverston's testimony regarding the meaning and consequences of an accounting reclassification - an accounting technique well within Silverstone's specialized area of expertise.

Raytheon also attacks Silverstone's qualifications by arguing that Silverstone cannot opine on the definition of the term as used in a bonus plan because he does not have any special training or specialized knowledge in the areas of bonus plans and government contracting. This argument mischaracterizes the thrust of Silverstone's report in this regard. Silverstone does not claim that accounting reclassifications, operational improvements, or process improvements have any special or changed meaning in the context of the RWIP. The opinions on permissible subjects for expert testimony in his report simply reflect his view regarding the meaning of technical terms within the accounting field.

Defendant does not challenge Silverstone's qualification as an expert in the field of accounting, only that accounting is not the applicable field and that "operational and process improvements" is not a term of art. Because I find that

34

accounting reclassification, operational improvement, and process improvement are technical business and accounting terms falling within Silverstone's area of expertise, I find that Silverstone is qualified to offer his expert opinion on the issues in his report which are properly the subject of expert testimony, as discussed above, *see supra* Section III(D)(1).

3.   Support for Silverstone's Expert Opinions

In the end, however, I have determined to exclude the Silverstone report in its entirety because even those opinions Silverstone provides - that are otherwise both within his area of expertise and proper subjects for expert testimony, are nevertheless unsupported.

In his expert report, Silverstone does not cite sources for any opinion or conclusion he offers.  In particular, Silverstone defines "accounting reclassification" and concludes that it categorically cannot constitute an operational or process improvement but he does so without reference to any authority whatsoever.  He merely provides a list of the documents he reviewed at the beginning of his report.  This list includes numerous court filings and prior court decisions in this case, but is conspicuously lacking in expert authorities.  Of the more than 20 documents he lists, only two are arguably authoritative expert sources: (1) a GAAP treatise entitled Interpretation and Application of Generally Accepted Accounting Principles, and (2)

a Raytheon Organizational Chart.  Silverstone lists an additional line item for "Other independent research," but these three line items are not sufficient to meet the requirements of Fed. R. Civ. P. 26(a)(2)(B).

Fed. R. Civ. P. 26(a)(2)(B) requires that an expert provide a written report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them," along with any "facts or data considered by the witness in forming them."  Silverstone's report does not provide any information from which an opposing expert could understand how he reached his conclusions.

Dyer argues that because Rule 702 provides that an expert may *qualify* to give testimony based on his "knowledge, skill, experience, training, or education," using the disjunctive term "or," *see* Fed. R. Evid. 702; *see also Daubert* v. *Merrel Dow Pham., Inc.*, 509 U.S. 579, 588 (1993), that an expert may rely exclusively on his experience in *asserting* an expert opinion in a report without reference to any authoritative source.  When asked in his deposition what he bases his definition of "operational and process improvements" on, Silverstone replied "[b]ased upon being in the accounting profession."  (Dkt. 136, Ex. 3 at 150-151.)  Dyer argues that this is sufficient.  I disagree.

I share the view that "[t]he primary purpose of Rule 26(a)(2) is to require disclosure of expert testimony

sufficiently in advance of trial so that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Flebotte*, 2000 WL 35539238, *7 (internal quotation marks omitted).  Silverstone's report does not provide Defendant's counsel or expert with a reasonable opportunity to prepare for cross examination or to address the reliability of any sources he may have considered in forming his opinions.

Silverstone also did not describe what exhibits he plans to reference at trial.  Without this information, Defendant cannot prepare for an effective cross examination.  This, too, is grounds for exclusion.  *See, e.g., Pena Crespo*, 408 F.3d at 13-14 (affirming a district courts decision to exclude expert testimony where the report "did not . . . explain the basis and reasons for Dr. Alonso's opinions [or] describe any exhibits Dr. Alonso planned on using.").

I therefore exclude the Silverstone report in its entirety for failure to comply with Rule 26(a)(2)(B).

### III. SUMMARY JUDGMENT

In their respective cross-motions for summary judgment, (A) Dyer, for his part, argues that Raytheon represented to the government that the RWIP would not compensate participants for accounting reclassifications, but later charged the government for the incentive payments tied to a $23.7 million

reclassification and (B) Raytheon, for its part, contends that
Dyer cannot demonstrate that RWIP categorically prohibited
accounting reclassifications, that including reclassifications in
the RWIP falls within the inherent discretion of Raytheon's
management to administer the plan, that Dyer has adduced no
evidence and identified no genuine dispute regarding the
proposition that Raytheon did not act with knowledge of the
falsity of any claim, and that the statements Dyer claims are
false cannot be the basis for an action under the False Claims
Act as a matter of law.  While many of the issues and facts are
intensely disputed and might ultimately turn on credibility
determinations inappropriate for summary judgment, I will enter
judgment against Dyer's claims because he has not adduced
sufficient evidence to create a genuine dispute of fact regarding
the question whether Raytheon had knowledge of the falsity of any
statements, a required element of his claim.

## A.   *Standard of Review*

A movant is entitled to summary judgment when "there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
"A dispute is genuine if the evidence about the fact is such that
a reasonable jury could resolve the point in the favor of the
non-moving party," and "[a] fact is material if it has the
potential of determining the outcome of the litigation." *Farmers*

*Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011)
(citation omitted).

I "view the facts in the light most favorable to the party
opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9,
10 (1st Cir. 2011).  However, "conclusory allegations, improbable
inferences, and unsupported speculation" are insufficient to
create a genuine issue of material fact to survive summary
judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st
Cir. 2009) (quotation and citation omitted).  In dealing with
cross-motions for summary judgment, I "must view each motion,
separately, through this prism." *Estate of Hevia* v. *Portrio
Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

## B. *Discussion*

In July 2011, I dismissed the retaliation claim asserted in
Count III of the Complaint, *see United States ex rel. Dyer* v.
*Raytheon Co.,* No. 08-cv-10341, 2011 WL 3294489, *14 (D.Mass. July
29, 2011).  Both Dyer and Raytheon now seek summary judgment on
the remaining two claims:  Count I, presenting a false or
fraudulent claim for payment or approval, and Count II, using a
false record or statement.  See 31 U.S.C. §§ 3729(a)(1), 3729
(a)(1).[1]  To prevail on his remaining claims, Dyer must

---

[1] Congress amended the False Claims Act ("FCA") in May 2009 with
the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No.
111-21, 123 Stat. 1617 (2009).  FERA re-designated § 3729(a)(1)
as § 3729(a)(1)(A), and re-designated § 3729(a)(2) as §
3729(a)(1)(B).  I note that the First Circuit has recognized that

demonstrate that Defendant "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1); *see also* 31 U.S.C. § 3729(a)(2) (providing for liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim").

Dyer must establish a false or fraudulent claim by showing that Defendant charged the government for indirect expenses - in this case, the RWIP incentive payments based on the Space Imaging accounting reclassification - while misrepresenting compliance with a "precondition of payment" set out in the plan.  *United States ex rel. Hutcheson* v. *Blackstone Med., Inc.*, 647 F.3d 377, 392 (1st Cir. 2011).  In this case, Dyer alleges the "preconditions of payment" with which Defendant misrepresented compliance are the "ground rules" of the RWIP, which did not allow accounting reclassifications.

Federal regulations 48 C.F.R. 31.205-6(a)(3) and 31.205-6(f) require that any indirect costs for incentive payments for which

---

§ 3729(a)(1)(B) applies retroactively but § 3729(a)(1)(A) does not.  *See United States ex rel. Loughren* v. *Unum Grp.,* 613 F.3d 300, 306 n.7 (1st Cir. 2010).  However, neither party in this action places any significance on the change, and either version appears to generate the same outcome.  For consistency within this memorandum and with previous memoranda in this case, I will refer to the pre-FERA versions of subsections § 3729(a)(1) and § 3729(a)(2).

a contractor like Raytheon seeks "allowable" reimbursement from the government must comply with the terms of an established compensation plan.  *See* 48 C.F.R. 31.205-6(a)(3) ("The compensation must be based upon and conform to the terms and conditions of the contractor's established compensation plan or practice followed so consistently as to imply, in effect, an agreement to make the payment."); 48 C.F.R. 31.205-6(f) ("Bonuses and incentive compensation are allowable provided the[y] . . . are paid . . . pursuant to an established plan or policy followed by the contractor . . . . so consistently as to imply, in effect, an agreement to make the payment.").   Therefore, if Raytheon deviated from the dictates of the plan, as Plaintiff alleges, its representation that the costs it submitted to the government were "allowable" reimbursements would have been false.

Dyer also alleges that by consciously making an exception to the "ground rules" of the RWIP, Raytheon engaged in a "major revision" of the established RWIP plan, as described in 48 C.F.R 31.205-6(a)(4), without first informing the government of the change.  Section 31.205-6(a)(4) provides that "[n]o presumption of allowability will exist where the contractor introduces major revisions of existing compensation plans . . . and the contractor has not provided [the government] . . . an opportunity to review the allowability of the changes."  However, Section 31.205-6(a)(4) does not *prevent* expenses from being "allowable" if the

41

contractor makes a major revision without first informing and obtaining the government's approval.  It merely provides that, without prior approval, there will be "[n]o *presumption* of allowability."  *Id.* (emphasis added).

In his brief, Dyer recounts his version of the facts, asserts that they are undisputed, quotes the FCA, and further asserts that the facts, as he describes them, entitle him to summary judgment.  For its part, Raytheon argues that it is entitled to summary judgment on four independent grounds: (1) the RWIP documents do not categorically prohibit accounting reclassifications and therefore its inclusion of the $23.7 million Space Imaging reclassification does not conflict with any representations Raytheon made to the government regarding the plan; (2) the RWIP inherently allows Raytheon managers to exercise discretion, (3) Dyer has produced no evidence that Raytheon "knowingly" submitted false claims, and (4) the invoices Dyer offers as the false statements on which he predicates his action cannot be false as a matter of law.

Briefly stated, I conclude that neither party has adduced sufficient evidence to determine whether or not the RWIP categorically prohibited accounting reclassifications or provided discretion to do so.  It is therefore not possible to determine at this stage whether including the Space Imaging reclassification in the RWIP could have been a reasonable

42

exercise of discretion.  I will nevertheless grant Defendant's
motion for summary judgment because Plaintiff has not adduced
evidence that would allow a reasonable jury to conclude that
Raytheon *knowingly* made any false claim to the government.  I
also find that the periodic, invoices Defendant submitted to the
government at a provisional rate cannot constitute false
statements as a matter of law.

### 1.  Categorical Prohibition

The government reimbursed Raytheon for its RWIP costs based
on Raytheon's representations, both implicit and explicit, that
these costs were "allowable" under the FAR.  FAR 31.205-6(f)
provides that reimbursements for such bonus compensation is
"allowable" if paid "pursuant to an established plan or policy."
Plaintiff alleges that Defendant's representations were false or
fraudulent because they "misrepresented compliance with a
precondition of payment" set out in the plan.  *Hutcheson*, 647
F.3d at 392-94.  The First Circuit has made clear that a claim
may be false even if the precondition of payment is not
"expressly stated in the relevant statute or regulations" but
rather is found in a contract, plan or other private document.
*Id.* at 386.  Dyer argues that the accepted "ground rules" for the
RWIP plan excluded accounting reclassifications and, therefore,
that Defendant violated a precondition of the established plan by
including bonus costs related to the Space Imaging accounting

43

reclassification among the expenses it charged to the government as "allowable" costs.  For Dyer to prevail on this point at summary judgment, he must show not only that the plan discouraged the inclusion of accounting reclassifications or that the plan excluded most kinds of accounting reclassifications, but that the plan categorically excluded all accounting reclassifications.  If the plan allowed for some accounting reclassifications but not others, there would be a genuine issue of material fact as to whether this particular reclassification fell within the limits of the plan or not.  I find that neither party is entitled to summary judgment on this issue.

Although Dyer is correct that the interpretation of the terms of a private document, such as a bonus plan, may be a question of law appropriate for determination at summary judgment, *see Pizzuti* v. *Polaroid Corp.*, 985 F.2d 13, 14 (1st Cir. 1993), the resolution of ambiguities in the plan is a factual matter for the jury.  *See Nolan* v. *CN8*, 656 F.3d 71, 81 (1st Cir. 2011) ("The interpretation of an unambiguous contract is a matter of law for the court . . . so, too, is the determination as to whether a contract contains an ambiguity."); *Great Clips, Inc.* v. *Hair Cuttery of Greater Boston, L.L.C.*, 591 F.3d 32, 35 (1st Cir. 2010) ("[C]ontracts are construed by the judge unless extrinsic evidence is offered to resolve supposed ambiguity . . . in the latter event, the dispute may go to a jury

so that it can resolve the underlying factual issues.").  There
is simply not enough information in the current record to
determine definitively whether the RWIP was intended to include
accounting reclassifications.

Only one RWIP document mentions "reclassifications": a
December 2000 Powerpoint presentation which Dyer drafted to the
Leadership Committee.  This presentation, drafted in the early
stages of the development of the RWIP, stated that "[t]he impact
of *reclassifications and other non-operational* accounting entries
will be neutralized."  Dyer places significant emphasis on this
document, and it might be compelling evidence that the RWIP
categorically excluded accounting reclassifications *except* that
Dyer admits that this phrase "did not survive the editing
process;" that McCauley deleted the phrase from all subsequent
presentations; and that McCauley, as Dyer's supervisor, "had
final editorial license on anything [Dyer] produced" regarding
the RWIP.  While McCauley's decision to delete the language does
not necessarily indicate that he intended to reject its content,
it does at a minimum create a genuine issue of material fact, and
cannot, therefore, be the basis for summary judgment in either
party's favor.

The only other express exclusion of accounting
reclassifications from the RWIP comes from Dyer's own testimony.
He testified that during the meeting with Herb Homer,

> [Homer] said, "Well, how do we keep from not making
> sure that we're just incentivizing these things." And
> at that point my only input to the conversation was,
> "Well, you can't just do a reclassification to move
> things out of working capital.  It's got to be a real
> improvement."

Raytheon challenges the credibility of Dyer's testimony,
indicating that "[n]o other evidence exists that corroborates
this supposed statement," and no documents from after the meeting
corroborate this interpretation of the plan.  Defendant further
argues that Dyer has already recanted similar statements.  For
instance, Dyer alleged in his Complaint that McCauley also
represented to Homer that accounting reclassifications would not
count towards the RWIP, but he later testified that he did not
recall that McCauley made any such representation.  Raytheon does
not present any evidence to affirmatively showing that Dyer *did
not* make the statements he claims because neither McCauley nor
Murphy have independent recollections of what anyone said at the
meeting, and Homer is deceased.  But Raytheon does dispute both
the content of the testimony and the sufficiency of the testimony
as evidence of the terms of the plan.  Thus, resolution of the
probative value of Dyer's testimony requires a credibility
determination inappropriate at the summary judgment stage.  *See
Agosto* v. *INS*, 436 U.S. 748, 756 (1978) ("[A] district court
generally cannot grant summary judgment based on its assessment
of the credibility of the evidence presented.").

Dyer offers two basic theories in support of his contention that the RWIP categorically excluded accounting reclassifications, both based on language stating that "only operational and process improvements count toward target achievement."  First, Plaintiff makes the specific argument that only "improvements which provided cash value were to be counted toward target achievement goals and the payment of incentive bonuses," both because the plan was designed to be self-funding - paying bonuses based on a percentage of the amount saved - and because the phrase "operational and process improvements" requires cash value.  He argues that because accounting reclassifications do not provide cash value and do not create revenue from which to pay bonuses, they must be excluded from the plan.  Second, Dyer makes a more general argument: that the meaning of the phrase "operational and process improvements," when used as an accounting term, cannot encompass accounting reclassifications.

Dyer's first argument does not withstand even cursory scrutiny in the summary judgment context.  It relies on fundamentally disputed testimony.  Plaintiff argues, based on his own deposition testimony and that of McCauley, that the RWIP was designed to create improvements "in daily operations resulting in increased cash flow."  (Dkt. 85 ¶¶ 22, 25.)  Yet Dyer himself also admitted in his deposition testimony that a variety of the

examples of improvements enumerated in the documents explaining the RWIP that would count toward payment of incentive bonuses would not themselves generate cash value.  For instance, the documents used in the presentation to Herb Homer included examples such as "develop[ing] working capital hot-list[s]," "MRP schedules," and holding "[p]roduct working capital standing meetings," which Dyer agreed would not themselves produce cash value, but would only produce cash value if the underlying content of those lists or meetings were acted upon.

Dyer explains that the examples are meant to convey that acting upon such initiatives would generate cash and therefore contribute to incentive compensation, but that reading is not clear from the face of the document itself.  Furthermore, other Raytheon employees testified that they did not understand cash value to be the lynchpin of the RWIP.  For example, Human Resources employee Sarah Sumner testified that she did not understand the plan to incentivize only actions that directly generate cash. (*See* Dkt. 105, Ex. 50, Sumner Tr. at 186:5-14 ("Q: 'Was it your understanding that . . . only actions that directly generated cash were the actions sought to be incentivized by the program?' A: 'No, far from it; and I think from the examples that were given in the materials demonstrate that.'")  As evidenced by this contradictory testimony, the meaning of "self-funding" is far from clear, and presents

credibility and fact disputes regarding the intent,
understanding, and explanation of the RWIP, which are not
susceptible to judgment as a matter of law.

Dyer's more general argument - that the phrase "operational
and process improvements" is fundamentally and categorically
incompatible with accounting reclassifications - is more
complicated, but ultimately also unavailing in the summary
judgment context.

Dyer offers six primary RWIP documents to confirm that the
RWIP contemplates only "operational and process improvements":
(1) the March 2001 presentation to the MDCC of Raytheon's Board
of Directors, (2) the brochure that Dyer drafted for RWIP
participants, (3) the July 2001 internal presentation on RWIP,
(4) the August 2001 briefing for Herb Homer of DCMA,[2] (5) the
briefing for C3I personnel, and (6) the letter from C3I President
Frank Marchilena to RWIP participants.  None of these documents

---

[2] Both parties place undue emphasis on the content of the
presentation to Homer, no doubt because he represented the
government in relevant interactions with Raytheon.  But Dyer's
claim does not rest on an allegation that the representation to
Homer was false.  It rests on the allegation that the
representations that all of the expenses it charged to the
government were allowable.  The Federal Acquisition Regulations
mandate that expenses for incentive compensation will only be
allowable if "paid . . . pursuant to an established plan or
policy followed by the contractor . . . so consistently as to
imply . . . an agreement to make the payment."  48 C.F.R.
31.205-6(f).  The relevant inquiry, therefore, is not what
Raytheon represented to Homer, but the terms of the established
plan within Raytheon.

expressly defines the phrase "operational and process improvements," but Dyer argues that, taken in the context of the purpose of the plan and the meaning of the relevant terms in the accounting field, it cannot encompass accounting reclassifications.

   a. *Purpose of the Plan*

   The parties agree that the purpose of the RWIP was to "improve operating efficiency and reduce Raytheon's investment in working capital with a goal of freeing up capital that Raytheon could use to pay down debt . . . and support the growth and development of the business."[3]   The parties also agree that the RWIP was designed to be "self-funding" such that participants who achieve target goals would receive a percentage of the interest savings earned by improving efficiency.   In the brochure Raytheon prepared to explain the program to its employees, Raytheon CFO Caine stated "[w]e are targeting to remove approximately $470 Million in working capital and save approximately $33 Million in interest. *This is where your payout comes from* . . . a portion of the interest saving will be used to reward the participants to have achieved this goal" (emphasis added).   Dyer contends that in order to serve the agreed-upon purpose of the RWIP, the "operational and process improvements" must not be artificial.

---

[3] Dyer alleges that an additional purpose of the RWIP was to increase cash flow, but Defendant disputes this.   I need not explore that contention in this setting.

Any improvements must be real in order to help Raytheon pay down its debt and self-fund the RWIP.

Dyer argues that the Space Imaging accounting reclassification was merely a bookkeeping measure that deferred present costs into to the future without producing any real gain. He testified that accounting reclassifications can never constitute operational or process improvements "no matter what." He also points to the testimony of James Singer, who served as Raytheon's Manager of Balance Sheet and Cash Flow.  Singer testified that an accounting reclassification is "like transferring your checking account to your savings account." However, when asked whether "Raytheon benefit[s] from a cash flow perspective in reclassifying a receivable . . . from a short term to a long term," answered "I would say generally not."  By saying "generally not," Singer declined to make a categorical statement and left open the possibility that some accounting reclassifications might benefit Raytheon's cash flow - the position for which Raytheon now advocates.  Singer's testimony does not support a categorical exclusion of accounting reclassifications from the meaning of "operational and process improvements."

Other witnesses also testified that "operational and process improvements" do not necessarily exclude reclassifications.  For instance, Durkin testified that "[t]here can be something that

becomes a reclassification that is an overall improvement" such as "negotiat[ing] new terms with vendors to pay at a later time so . . . it puts cash out further, that would be an operational improvement."  Similarly, Caine testified that the question whether a reclassification would constitute operational improvement would "depend on the facts and circumstances causing the reclassification."

Therefore, the parties dispute whether an accounting reclassification can ever provide the kind of improvements the RWIP was designed to incentivize.  Raytheon argues that this alone entitles it to summary judgment because "[t]he existence of more than one legitimate interpretation of a statute or regulation also determines the objective validity or falsity of the claim" and without objective falsity, Plaintiff's claim must fail.  John T. Boese, *Civil False Claims and Qui Tam Actions* §2.03[B] (4th Ed. 2012); *see also United States ex rel. Jones* v. *Brigham and Women's Hosp.*, 678 F.3d 72, 87 (1st Cir. 2012). However, the fact that witnesses testify to more than one interpretation of the plan does not necessarily indicate that both interpretations are legitimate or reasonable.  Rather, it militates in favor of reference to an authority in the field to determine whether one, the other, or both interpretations are legitimate.

b. *Defining Accounting Terms*

Dyer cites and relies on a number of inadmissible documents in support of its argument that within the accounting field, accounting reclassifications are not considered "operational and process improvements."

*First*, as discussed above, *see supra* Section II(E), Howard Silverstone's expert report is inadmissible because it fails to articulate the basis or source of any for his opinions.

*Second*, Dyer asks the court to take judicial notice of an online self-study course in Business Process Improvements, which states "the objective of business process improvements is to continually improve process productivity.  Process productivity is measured in terms of effectiveness, efficiency and quality." Not only is this definition far from illuminating, the document also cannot properly be the subject of judicial notice.

A court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  An online self-study course falls far below the standard for a source "whose accuracy cannot reasonably be questioned." Furthermore, the posture of this case makes clear that the definition of "operational and procedural improvements" is somewhat controversial and therefore inappropriate for judicial notice.  *Cf. United States* v. *Bello*, 194 F.3d 18, 23 (1st Cir.

1999) (taking judicial notice of geography because "locations are facts which are not generally controversial").

*Finally*, Dyer offers a GAAP treatise, which may be a proper source for an expert to consider and incorporate into his report, but is not an appropriate document for judicial notice in this context.  As a preliminary matter, the treatise states that "[accounting] [re]classifications are not explicitly dealt with in GAAP but nevertheless do commonly occur in practice."  The treatise specifically disavows its own authority regarding the meaning and interpretation of reclassification, and Defendant might reasonably question the accuracy of its content, making it inappropriate for judicial notice.  *See* Fed. R. Evid. 201(b)(2).  Furthermore, the treatise is not competent evidence in support of Plaintiff's position because it does not mention or discuss operational or process improvements.  It does not even use the words "operational" or "process," or discuss them conceptually.  It merely explains the concept of a reclassification.  This does not support Dyer's position.

Ultimately, because I find that none of the documents Dyer offers are admissible and because Defendant does not offer any documents or proposed meaning for "operational and process improvements," electing instead to claim that the phrase is ambiguous and vague, I find that there is no competent evidence in the record on which I might base a finding regarding the

meaning of the phrase "operational and process improvements."  As a formal matter, this weighs against the Plaintiff because he bears the burden at trial to show that the RWIP plan excludes reclassifications.  *See Perez* v. *Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001) (absence of evidence on a material issue weighs against the party who would bear the burden of proof at trial on that issue).  However, I find that neither party is entitled to summary judgment on this issue.

Notwithstanding the barren record on this motion, the question whether an accounting reclassification could constitute an "operational and process improvement" is properly the subject of expert testimony.  These terms have specific meaning in the context of business and accounting with which laymen are not familiar.  Expert testimony on the meaning of these terms would therefore assist the trier of fact to intelligently and rationally determine the issue.  *United States* v. *Shay*, 57 F.3d 126, 132 (1st Cir. 1995) ("The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." (internal alterations and quotation marks omitted)).

Defendant's argument that the phrase "operational and process improvement" is not itself a term of art misses the point.  Accounting reclassification, operational improvement, and process improvement are terms with particular meaning in business and accounting that are not intuitively or immediately clear to a layman, and an expert's testimony could assist the trier of fact to understand the meaning of these terms in this context.  Although Raytheon argues that the phrase is insolubly ambiguous and vague, it supports this theory only with the contradictory testimony of various witnesses.  As discussed above, the fact that certain witnesses held contradictory understandings of the phrase does not mean that all of them were reasonable or legitimate.  It is possible that the phrase and its terms do have some objective meaning and that an accounting reclassification does not qualify as an operational improvement or process improvement as those terms are used in business and accounting, but I cannot make a determination either way on the record before me.

   2.   Discretion

Raytheon argues that even if the RWIP did not allow for accounting reclassifications, it allowed Raytheon managers sufficient discretion in the administration of the plan to include a particular reclassification when it determined that it served the purposes and policies of the RWIP.

Raytheon is correct that some amount of managerial discretion is always inherent in the administration of an incentive compensation plan such as the RWIP.  The internal RWIP brochure that Dyer himself designed states that "all awards are subject to final approval by the RWIP committee."  The question is where the limits of this discretion lie.  The administration of such a plan requires managers to determine whether the participants have met their goals - in this case, how much working capital they have freed - and requires them to allocate the savings among the participants.  These determinations are not always so ministerial that managers can make them without any exercise of discretion.  In this case, the RWIP requires managers to determine whether participants' business decisions satisfy the strictures and purposes of the plan such that they count toward target achievement goals.

The Armed Services Board of Contract Appeals ("ASBCA"), which decides disputes between government contractors and the Department of Defense, has held that government contractors' managements must have some level of inherent discretion to administer compensation plans.  *See Appeal of Bell Helicopter Co.*, ASBCA Nos. 9625, 10193, 65-1 BCA ¶ 4865, 1965 WL 293 ("[T]he top management of a company must exercise discretion [in determining who may participate in a plan].  That is presumably what top management is for . . .").  Various Raytheon managers

have testified that there must be some amount of discretion in administering a plan such as the RWIP.  As Raytheon's Caine testified, "like all incentive programs, there was a provision - implicit, if not explicit provision - where management can exercise discretion in the event there was a disagreement or there are two sides to a particular issue."  Similarly, McCauley testified that "all of these programs of this kind obviously have a management discretion component in them."

This discretion must, of course, have limits.  Otherwise the terms of the plan would be so elastic as to be meaningless and 48 C.F.R. 31.205, requiring that costs are only allowable if paid pursuant to an established plan or policy, would have no effect at all.  *See Boeing Aerospace Operations, Inc.*, ASBCA Nos. 46274, 46275, 94-2 (B.C.A. CCH), 1994 WL 96970, p. 26802 ("The making of payments with numerous and extreme variations in amounts, for purposes of rewarding or penalizing employees at the whim of management, or denying payment to otherwise eligible individuals is a type of unlimited discretion that would preclude our finding an established policy or practice.").  No one could fairly describe the act of determining what constitutes an "operational and process improvement" as purely ministerial.  Any such standard blurs at the edges, calling for the exercise of reasonable discretion in borderline judgment calls.  However, this does not provide Raytheon with carte blanche to classify any

58

sound business decision as an "operational and process improvement" without reference or respect to the meaning of those words.  It must reasonably interpret the plan provisions when determining whether to count a particular item.

The ASBCA has held that even ad hoc exceptions to a bonus plan may be allowable so long as they are reasonable.  *See Appeal of Lockheed Aircraft Corp.*, ASBCA No. 3955, 59-1 BCA ¶ 2250, 1959 WL 466.  Similarly, the First Circuit has held "expressions of opinion . . . or statements as to conclusions about which reasonable minds may differ cannot be false."  *Brigham & Women's Hosp.*, 678 F.3d 72, 87.  Therefore, if Raytheon's inclusion of the Space Imaging reclassification toward C3I's RWIP goals constitutes a reasonable interpretation of the plan, its representation to the government that the costs it submitted were allowable were not false, and Dyer cannot sustain his claim.

Raytheon argues that its decision to count the Space Imaging reclassification toward C3I's RWIP incentive bonus was reasonable because it made good business sense and because it avoided the need either to loan Space Imaging the cash it needed to stay solvent or write off the receivable altogether.  However, Raytheon has not provided any justification for considering every decision that makes good business sense an operational or process improvement.  Nor is its argument that the Space Imaging reclassification provided cash value the only reasonable view.

As discussed above, *see supra* Section IV(B)(1), cash value is not necessarily the determining factor for whether something falls within the provisions of the RWIP.  Furthermore, Raytheon argues that the reclassification provided cash value because it avoided the need to extend a cash loan to Space Imaging.  However, reclassifying a short-term receivable into a long-term asset generally trades the certainty of a default in the short term for the possibility of default in the long term.  Although it has the potential to delay or prevent recording a loss on the books, it does not appear, on its face, to be the kind of improvement that would "free[] up capital that Raytheon could use to pay down debt . . . and support the growth and development of the business," a purpose both parties acknowledge is the purpose of the RWIP.

The question whether Raytheon managers *reasonably* exercised discretion in deciding that the Space Imaging reclassification fell within the parameters of the plan therefore turns on whether an accounting reclassification can constitute an "operational and process improvement."  As discussed above, *see supra* Section IV(B)(1), there is insufficient evidence in the record to make that determination.  As a result, there is also insufficient evidence in the record to determine definitively whether Defendant reasonably or unreasonably exercised discretion. Neither party is entitled to summary judgment on this issue.

### 3.   Retroactive Application

At the motion hearing, Plaintiff raised a new argument not developed in the summary judgment briefing material: that because the Space Imaging reclassification occurred in January 2001, before Raytheon approved the RWIP in March 2001, any RWIP bonuses based on the reclassification could not have been part of an established compensation plan.  Having failed to raise this argument in the Complaint, during discovery, or in briefing the summary judgment motions, Dyer has waived his right to assert it.  As the First Circuit has held - albeit in the criminal context - "except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived." *United States* v. *Giggey*, 551 F.3d 27, 36-37 (1st Cir. 2008).  This is not such an extraordinary circumstance.  Plaintiff has been aware of the chronology of the events comprising this case since they occurred 12 years ago.  He has also not asserted this position in the more than 5-year travel of this litigation, nor has he offered any explanation justifying such a delay.

Although I am generally reticent to find waiver, preferring to rule on the merits of what arguments the parties present, allowing Dyer to assert this eleventh-hour theory of liability would prejudice Raytheon.  Fact discovery closed in this case in September 2012 without any mention of this theory of liability,

which Plaintiff raised for the first time five months later. Raytheon has not had any opportunity to develop evidence on this theory and now cannot do so without reopening discovery.  I therefore find that Dyer has waived his right to assert his new retroactivity argument.

Even if I were to find that Dyer had not waived this argument, he would not be entitled to summary judgment.  Dyer supports his argument that actions before Raytheon approved the program were not eligible for RWIP compensation on two bases: (1) the fact that there is no evidence that RWIP specifically contemplated retroactive application, and (2) the prospective nature of the word "incentive" in "Raytheon Working Capital Incentive Plan."  Neither is convincing.

Although there is little evidence in the record that RWIP specifically approved the notion of retroactive application - an unsurprising situation given that Dyer himself did not raise this theory after the close of discovery - neither is there any evidence that RWIP prohibited retroactive application.  What sparse evidence does exist in the record is consistent with the contemplation of retroactive application.  For instance, Dyer's own November 30, 2001 email asked managers to "identify and exclude . . . the reclassifications (if any) made during the first 11 months of 2001 . . . ."  If actions before Raytheon approved RWIP were not eligible to be included, there would be no

reason to direct exclusion reclassifications from the first few months of 2001.  All actions during that time period would have been excluded whether reclassifications or otherwise.  Similarly, the informational briefing Raytheon presented to Herb Homer, and which Dyer drafted, compares the "2000 Actual" and the "2001 target" for every month in 2001 including those before Raytheon approved RWIP.  If actions before March 2001 were ineligible for compensation under RWIP, there would be no reason to establish targets for those months in comparison to the previous year. There is sufficient evidence in the record, even if waiver were not applicable, to preclude summary judgment in Plaintiff's favor on retroactivity grounds.

    4.   Knowledge

    Raytheon argues that Dyer has not presented sufficient evidence to raise a genuine issue of fact regarding Raytheon's state of mind.  To prevail on his claims, Dyer need not prove a "specific intent to defraud," but he must show that Defendant had (i) "actual knowledge" of falsity, (ii) "act[ed] in deliberate ignorance of the truth or falsity of the information," or (iii) "act[ed] in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).  The "collective knowledge" doctrine does not apply to FCA claims, therefore Dyer must show that a single individual, acting on behalf of Raytheon had the requisite knowledge and approved the false claims.  *See United*

*States* v. *United Tech. Corp.*, 51 F. Supp. 2d 167, 197-99 (D. Conn. 1999); *see also* John T. Boese, *Civil False Claims and Qui Tam Actions* §2.08[B] (4th Ed. 2012).  I find Dyer has not provided sufficient evidence to establish Raytheon's knowledge. Raytheon is therefore entitled to judgment as a matter of law.

Dyer is unable to show any of the classic indicia of fraud. He does not offer any document from a Raytheon employee (other than from Dyer himself) admitting that including an accounting reclassification toward RWIP goals violated the dictates of the plan.  Nor has any Raytheon witness (other than Dyer himself) admitted in deposition testimony that he or she knew the RWIP precluded accounting reclassifications.  He offers no evidence whatsoever that any Raytheon officer believed RWIP prohibited retroactive application.  *See supra* Section IV(B)(3).  Evidence that the plan was designed to incentivize certain future actions is no evidence that the plan ignored past actions.  Rather, Dyer offers three pieces of evidence he contends demonstrate that Raytheon knew RWIP excluded accounting reclassifications: (1) that Dyer himself called the issue to Defendant's attention on numerous occasions, (2) that the Fourth Quarter Working Capital Report (which indicates that certain accounting reclassifications were excluded) does not mention the Space Imaging reclassification, and (3) that in Caine's deposition testimony he characterizes allowing the Space Imaging accounting

reclassification as an "exception."  None of these pieces of evidence are probative of knowledge of falsity.

a. *Dyer Warnings*

Dyer first argues that Raytheon had knowledge of the falsity of the claims because Dyer himself made numerous efforts to inform RWIP participants and Raytheon management alike that accounting reclassifications were not allowed under the plan.

When Dyer learned that C3I had counted a $23.7 million accounting reclassification toward its RWIP targets, he sent an email to the CFOs of all the business units participating in the RWIP stating that the "ground rules" of the RWIP "stated only process improvements would count toward goal achievement" and directing them to "identify and exclude any reclassifications made between capital accounts and other balance sheet accounts." (Dkt. 98, Ex. 20 at 1.)  He also emailed Duncan Noyes, the Manager of Budget & Planning for C3I, specifically informing him that "any accounting reclassifications which affect the 2000 baseline to the 2001 actual must be recognized."  He made repeated efforts to raise the issue with his superiors, speaking first to McCauley, his direct supervisor, then when McCauley told him of the decision to allow the reclassification, he raised the issue to Ed Pilner, Raytheon's Corporate Controller.  When Pilner agreed with McCauley's determination, Dyer expressed interest in

raising the issue to Caine, Raytheon's CFO, but McCauley told him "we're not going to talk about this anymore."

Dyer doggedly pursued the issue and raised his concern to multiple levels of Raytheon's management.  He argues that this is evidence of Raytheon's knowledge of falsity because "the [FCA] covers not just those who set out to defraud the government, but also those who ignore obvious warning signs." *Crane Helicopter Serv., Inc.* v. *United States*, 45 Fed. Cl. 410, 433 (1999). However, Raytheon did not ignore the Dyer warnings.  It addressed them at every stage of the process but simply disagreed with Dyer's conclusion.  Each Raytheon manager to whom Dyer addressed his concern responded that Raytheon had determined that this particular accounting reclassification served the purposes of the RWIP and was eligible to count toward C3I's targets.  Dyer's doggedness did not escape the attention of Raytheon's management. When McCauley raised Dyer's concern to C3I's CFO, David Farnsworth, Farnsworth expressed frustration in his reply email, explaining his reasoning at length and referring to Dyer as an "idiot" for raising concern over the mechanism of the transaction rather than its substance.  Farnsworth wrote,

> we chose not to increase the loan directly [through an
> outlay of cash to Space Imaging] because we would have
> had to cover half of [Lockheed Martin's share] as well
> – good decision – but this is the same as [Space
> Imaging] paying us the rec[eivable] then us loaning
> them for their other cash requirements an equivalent
> amount.  To me, [accounts receivable] is deemed paid
> with a new note payable that [F]rank agreed to.

In essence, Farnsworth explained that the reclassification should count toward the RWIP because it was merely a mechanism to provide Space Imaging a longer term loan to pay off its short term debt, but without the need to expend the actual cash, resulting in savings to Raytheon.

Dyer's persistence may be evidence of his own perspective, but it is not evidence that any decision maker at Raytheon believed the Space Imaging reclassification could not count toward RWIP goals.  In fact, the uncontested evidence indicates that all Raytheon decision makers to address the subject believed that the reclassification fell within the purposes and rules of the plan.  Dyer's own belief, no matter how frequently expressed to others, cannot constitute evidence of Raytheon's knowledge.

b.   *The Fourth Quarter Working Capital Report*

After McCauley rejected Dyer's request to raise the issue of the Space Imaging reclassification to Caine, saying "This issue is over.  We're not going to do this any more," Dyer made one last attempt to raise the issue.  When he prepared the Fourth Quarter Working Capital Report for 2001, he included language stating "[t]he results have not been adjusted to negate for a $23.7 million reclass[ification] of short term receivable to the long-term asset account."  Having already explained Raytheon's decision to include the Space Imaging reclassification toward the RWIP, and therefore toward working capital savings, McCauley

deleted this language.   Dyer contends that the fact that McCauley removed this language but left the statement that "C3I results have been adjusted to exclude the turnover benefit (.05x) from short-term asset reductions created by accounting transactions which reclassified those assets to long-term," is evidence that McCauley was conscious of the fact that reclassifications would not count toward RWIP targets.   This is not a fair reading. McCauley removed the language regarding the Space Imaging reclassification because in that particular instance, Raytheon had decided that reclassification served the purposes of the RWIP.   He left the discussion of the exclusion of other reclassifications because they did not serve the same ends.

McCauley's actions regarding the Fourth Quarter Working Capital Report are entirely consistent with his prior discussions with Dyer, explaining that in certain instances - such as with Space Imaging - reclassifications can serve the ends of the RWIP, while in other instances they do not.   Thus, the Fourth Quarter Working Capital Report is not evidence of conscious wrongdoing in light of McCauley's prior explanations why he believes the Space Imaging reclassification in particular met the criteria for the plan.   It merely corroborates earlier evidence of Raytheon's careful consideration of the question whether the Space Imaging transaction qualified for inclusion in the RWIP, and its good faith conclusion that it could.

*c.   Caine's Testimony*

Finally, Plaintiff suggests that Caine's deposition testimony, in which he described the Space Imaging reclassification as an "exception" is evidence that he understood it fell outside the provisions of the RWIP.  Caine testified that the $23.7 Million Space Imaging reclassification constituted "an exception to the guidelines based on the fact that it made good business sense for Raytheon Corporation to behave this way instead of any other alternative because it would have wound up with the company overfinancing Space Imaging or winding up in a disadvantageous position . . . ."  This too, however, is not evidence of conscious wrongdoing or knowledge that the Space Imaging accounting reclassification could not count toward C3I's RWIP targets.

Caine later clarified that he considered "anything that comes up for conversation [to be] an exception.  If it doesn't come up for conversation, there's nothing to talk – there's no issue."  This, too, corroborates earlier evidence that Raytheon carefully considered whether the Space Imaging transaction qualified for inclusion in the RWIP, and its good faith conclusion that it could.  The fact that Caine used the word "exception" does not in context indicate that he believed counting the reclassification toward RWIP goals violated the rules of the plan.  To the contrary, it indicates that Raytheon

specifically addressed the question whether this transaction qualified for inclusion in the RWIP and concluded that it did.

### d.   Additional Consideration

Even if Plaintiff could show that a single Raytheon decision-maker knew that accounting reclassifications fell outside the boundaries of the RWIP, he has not produced any evidence whatsoever to show that any Raytheon employee or decision maker did not believe he or she had the discretion under the plan to include a particular reclassification.

As discussed above, Caine and McCauley both testified that they believed the RWIP provided them with this level of discretion, and others testified similarly.  Plaintiff has produced no evidence to the contrary.  There is therefore no genuine dispute with respect to the fact that the Raytheon decision makers believed they had discretion under the RWIP to include the Space Imaging reclassification.  This entitles Raytheon to judgment as a matter of law because a good faith error cannot be the basis for FCA liability.  *See United States ex rel. Lockyer* v. *Hawaii Pac. Health Grp. Plan.*, 343 F. App'x 279, 281 (9th Cir. 2009) ("A defendant's good faith interpretation of a regulation does not give rise to liability, not because his or her interpretation was correct or reasonable but because the good faith nature of his or her action forecloses

the possibility that the scienter requirement is met." (internal quotation marks omitted)).

Some courts have held that a good faith interpretation does not even have to be reasonable to preclude a finding of scienter. In *United States* v. *Aerojet Gen. Corp.*, No. CV-95-4123, 1996 WL 33147960, *3 (C.D. Cal. May 1, 1996), the court held that "[a]lthough there is evidence that Aerojet's claims may be unreasonable under the FAR, such proof of mistake is not evidence that Aerojet is a 'cheat' or that Aerojet 'lied.'"  Thus, even if Dyer could show that Raytheon decision makers *unreasonably* believed they had discretion to include the Space Imaging reclassification toward C3I's targets, that still might not be enough to survive summary judgment.

Because knowledge is an essential element of Dyer's claim, his claim fails and I enter judgment for Raytheon.

### 5.   False Invoices

Because RWIP compensation is an indirect cost, Defendant sought reimbursement from the government piecemeal though hundreds or thousands of different invoices.  Plaintiff contends that the C3S section of the C3I unit submitted at least 901 invoices, and the IIS section of the C3I unit submitted at least 751 invoices implicating reimbursement for RWIP bonuses related to the $23.7 million Space Imaging reclassification.  In his initial disclosures, he suggests there may have been as many as

71

30,000 such invoices.  He argues that each and every one of these invoices constituted a false claim.  Defendant argues that these invoices cannot constitute false claims because Defendant charged a set rate and did not certify compliance with any statute or regulation, either expressly or impliedly, other than the agreed upon provisional rate for all indirect costs.

*a. The Indirect Cost-Billing Procedure*

The parties do not dispute the process through which Defendant charged the government for its indirect costs.[4]  The government establishes a provisional cost billing rate at the beginning of each year so that Raytheon can recover its costs over the course of the year despite the fact that it does not yet know the actual amount of its indirect costs for the year.  The government establishes this rate by reviewing previous rate audits, billing data, and from the particular contracting officer's experience with other contracting activities.  *See* 48 C.F.R. 42.704(b).  Once that rate is established, Raytheon periodically invoices the government based on the provisional cost billing rate throughout the year, rather than billing based on its actual costs.

At the end of the year, Raytheon calculates is actual costs and submits final indirect cost rate proposals for each relevant

---

[4] Indirect costs are costs such as overhead, incentive compensation, and administrative expenses, which are not tied to a particular contract with the government.

business.  These final proposals include a representation,
required by FAR, *see* 48 C.F.R. 42.703-2, that,

> [a]ll costs included in this proposal . . . are
> allowable in accordance with the cost principles of the
> Federal Acquisition Regulation (FAR) and its
> supplements applicable to the contracts to which the
> final indirect cost rates will apply; and . . . [t]his
> proposal does not include any costs which are expressly
> unallowable under applicable cost principles of FAR or
> its supplements.

The Defense Contract Audit Agency ("DCAA") then audits the final
proposal for potentially unallowable costs and makes a
recommendation to the Defense Contract Management Agency ("DCMA")
officer, who makes the final decisions on any remaining questions
concerning the allowability of costs.  *See* 48 C.F.R. 42.705-1(b).
Once the audit is complete, Raytheon and the government negotiate
the final indirect cost rate for the year and Raytheon issues a
final set of invoices designed to account for any discrepancy
between the provisional billing rate and the final one.  *See id.*

Dyer asserts Raytheon submitted the entire amount of the
$3.4 million bonus payments for the C3I business unit.  Defendant
acknowledges that it submitted some portion of the $3.4 million
to the government for reimbursement, but disputes that it
submitted the entire amount.

*b. Discussion*

Dyer alleges that the $23.7 million accounting
reclassification constituted approximately one third of the
working capital turnover improvement that C3I reported for Plan

Year 2001.  He therefore alleges that Defendant's false claims resulted in approximately $1.165 million of the total $3.4 million C3I received.  He argues that because Defendant submitted approximately $1.165 million in allegedly unallowable costs related to the Space Imaging accounting reclassification, the provisional billing rate that the government determined was falsely inflated.  He reasons that each and every provisional invoice Raytheon submitted to the government based on this allegedly inflated provisional billing rate constituted a false claim under an implied certification theory.  The implied certification theory states that even when a contractor does not expressly certify compliance with a statute or regulation, the submission of a claim for payment implies that it complies with all statutory and regulatory pre-conditions to payment.  *See United States ex rel. Hutcheson* v. *Blackstone Medical, Inc.*, 647 F.3d 377, 383 (1st Cir. 2011).  This cannot be the case.

When Raytheon submits the invoices, each invoice bills the government at the established provisional billing rate until the end-of-year final application invoices which are designed to account for any discrepancies.  In *Massachusetts* v. *Schering-Plough Corp*, Judge Saris rejected the idea that a Defendant could be liable under the FCA for statements that are not themselves fraudulent, but were merely "grounded in fraud."  *See* No. 03-11865, 2011 WL 4436969, *3 (D. Mass. Sept. 23, 2011).  She held

74

that "[w]hile *Hutcheson* does support the contention that claims can be false or fraudulent even if not false on their face, the claims submitted to the government must still include false representations, either express or implied." *Id.*  In this case, the invoices do not include any false representation, either express or implied.  Submitting each invoice is not an implied certification of compliance with any statute or regulation because the invoices do not bill for actual expenses which might be allowable or unallowable.  They merely reflect that the next payment at the provisional rate has come due.  *See* 48 C.F.R. 52.216-7(e) ("Until final annual indirect cost rates are established . . . , the Government shall reimburse the Contractor at [the provisional] billing rates established . . . subject to adjustment when the final rates are established.").  If there is any implied certification, it could only be that the invoices accurately reflect the agreed-upon provisional billing rate.  As a result, they cannot and do not falsely represent or certify compliance with federal billing regulations, as Plaintiff suggests.

Dyer argues that the legislative history of the act indicates that each invoice constitutes a false claim.  The Senate Report for the FCA states that "each and every claim submitted under a[n] . . . agreement which was originally obtained by means of false statements . . . constitutes a false

75

claim." S. Rep. No. 99-345, 99th Cong. 2d Sess. 9, *reprinted in*

1986 U.S.C.C.A.N. 9260, 5274. However, that language is not in

the text of the law itself, and as various courts have indicated,

imposing it wholesale into the statue without care could lead to

perverse and irrational results. The Eighth Circuit, considering

a Medicare False Claims Act case, rejected the government's

theory that each individual invoice constituted a false claim.

The court noted that "a one-time expense . . . may be reimbursed

over hundreds or many thousands of claims . . . . [T]his

protracted method of government reimbursement produces a

$1,000,000 penalty (200 claims times $5,000 per claim) that bears

no rational relationship to the false claim misconduct

." *Hays v. Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003); *see also*

*United States ex rel. Hockett* v. *Columbia/HCA Healthcare Corp.*,

498 F. Supp. 2d 25, 71 (D.D.C. 2007) (finding that "[i]t is the

cost report that . . . contained the false statements" not the

individual invoices based on that report). The same irrational

outcome would occur in this case. Plaintiff's method of defining

false claims would produce a fine of at least $13.216 million

(based on the "minimum" number of false claims he alleges - 751

claims from IIS and 901 claims from C3S multiplied by an $8,000

fine per claim[5]), and as high as $561 million (based on

_____

[5] 31 U.S.C. § 3729(a)(1)(G) provides for a civil penalty of not
less than $5,000 and not more than $10,000, adjusted by the
Federal Civil Penalties Inflation Adjustment Act of 1990, for

Plaintiff's estimate of 33,000 claims multiplied by an $17,000 fine per claim).   A fine of this magnitude simply cannot have any rational relationship to the alleged misconduct in this case: charging the government for, at most, $1.165 million in unallowable expenses.

I find that the individual invoices at the provisional rate cannot constitute false claims as a matter of law.   Only the final indirect cost rate proposals, which reflect actual expenses and certify that they are allowable under the Federal Acquisition Regulations, make sufficient representations of compliance to constitute false claims.

## V.   CONCLUSION

For the foregoing reasons,

Plaintiff's motion asserting that the Defendants responses to the requests for admission are inadequate (Dkt. 69) is DENIED;

Plaintiff's Motion to Compel (Dkt. 94) is DENIED;

Plaintiff's Motion to Exclude Portions of the Testimony of Stephen Kiraly (Dkt. 150) is DENIED;

Plaintiff's Motion to Strike Paragraphs 7 and 8 of the McCauley Declaration (Dkt. 101) is DENIED;

---

each false claim.   For the sake of approximating damages, and without deciding the issue, the inflation adjustment between 1986, when Congress last set the penalty for the FAC, and 2001 when the alleged fraudulent conduct occurred yields a civil penalty of between $8,000 and $17,000.   *See* 28 U.S.C. § 2461.

Defendant's Motion to Exclude or Limit the Testimony of Howard Silverstone (Dkt. 128) is GRANTED;

Plaintiff's Motion for Partial Summary Judgment (Dkt. 86) is DENIED; and

Defendant's Motion for Summary Judgment (Dkt. 78) is GRANTED.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE